In re Roddy Mac STEWART and Deborah B. Stewart, also known as Debbie B. Stewart and also known as Debbie Stewart, Debtors.

The Cadle Company, Plaintiff–Appellant,

v.

Roddy Mac Stewart and Deborah B. Stewart, Defendants–Appellees.

BAP No. KS–00–067.
Bankruptcy No. 98–41315.
Adversary No. 98–7100.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

June 20, 2001.

Thomas J. Fritzlen, Jr. of Martin Leigh & Laws, P.C., Kansas City, MO, for Plaintiff–Appellant.

Edward J. Nazar of Redmond & Nazar, L.L.P., Wichita, KS, for Defendants–Appellees.

Before McFEELEY, Chief Judge, CLARK, and BOHANON, Bankruptcy Judges.

## OPINION

CLARK, Bankruptcy Judge.

The Cadle Company ("Cadle") appeals a judgment of the United States Bankruptcy Court for the District of Kansas rejecting its claim that the Chapter 7 discharge of Roddy Mac Stewart ("Rod") and Deborah B. Stewart ("Deb") (collectively, the "debtors") should be denied under 11 U.S.C. § 727(a)(2)(A), (3), (4)(A), or (5). For the reasons stated below, the bankruptcy court is AFFIRMED.

## I. *Background*

RTC Mortgage Trust foreclosed on certain property owned by the debtors, and then assigned its $450,000 deficiency judgment against the debtors to Cadle. In late 1997, Cadle commenced collection proceedings, serving discovery requests on the debtors. The debtors did not respond to the discovery requests, and Cadle obtained a state court order compelling the debtors to respond no later than May 14, 1998. The debtors did not comply with the state court order, but instead filed a Chapter 7 petition on May 15, 1998.

The debtors listed Cadle as a joint creditor holding a general unsecured claim in the approximate amount of $370,000. Cadle filed a proof of claim asserting a general unsecured claim in the approximate amount of $500,000. Cadle also commenced the adversary proceeding that is the subject of this appeal against the debtors, seeking the denial of the debtors' discharge under § 727(a)(2)(A), (3), (4)(A), or (5).[1]

In September 1999, the bankruptcy court conducted a three-day trial on Cadle's § 727(a) complaint. During trial, the debtors produced certain bank statements, their 1997 federal tax return, and other information concerning their assets. At the conclusion of the trial, the bankruptcy court took the matter under advisement, but ordered the parties to submit a post-trial reconciliation of the debtors' accounts to explain what had happened to their 1997 income. The parties each filed account reconciliations, which the bankruptcy court considered as part of the § 727(a)(3) and (5) causes of action.[2]

In September 2000, the bankruptcy court entered a Memorandum of Decision and a separate Judgment in the § 727(a) action, denying Cadle's claims. Cadle timely filed a notice of appeal from the

---

1. Cadle also sought to deny the debtors' discharge under § 727(a)(7), but the parties later stipulated to the dismissal of that cause of action.

2. In February 2000, the bankruptcy court partially granted Cadle's motion that the pleadings be amended to conform to the evidence that the debtors had submitted at trial, holding that the account reconciliations would be considered as additional grounds for denial of the debtors' discharge under § 727(a)(3) and (5).

bankruptcy court's final judgment, and the parties have consented to this Court's jurisdiction over the appeal. *See* 28 U.S.C. §§ 158(a)(1) & (c)(1); Fed. R. Bankr.P. 8001(a) & 8002(a); 10th Cir. BAP L.R. 8001–1.

## II. *Discussion*

■ Cadle argues on appeal that the bankruptcy court's Judgment rejecting its § 727(a) causes of action is clearly erroneous. As the parties did not question the applicable law below, there is no dispute that the clearly erroneous standard of review applies.[3] *See Holaday v. Seay (In re Seay)*, 215 B.R. 780, 788 (10th Cir. BAP 1997); *Farm Credit Bank v. Hodgson (In re Hodgson)*, 167 B.R. 945, 947 (D.Kan. 1994). The bankruptcy court's ruling will be clearly erroneous only if the Court has a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Each subsection of § 727(a) asserted by Cadle, as well as the bankruptcy court's findings related to each section, are discussed and analyzed under this standard below.

### 1. *Section 727(a)(2)(A)*

■ Section 727(a)(2)(A) provides: "The court shall grant the debtor a discharge, unless— ... (2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred [or] removed ... (A) property of the debtor, within one year before the date of the filing of the petition...." 11 U.S.C. § 727(a)(2)(A). The Tenth Circuit has held that to deny a discharge under this section, a court must

find "*actual* intent to defraud creditors." *In re Carey*, 938 F.2d 1073, 1077 (10th Cir.1991) (emphasis in the original). In *Carey*, the Tenth Circuit stated:

> [E]xtrinsic evidence of fraudulent intent is required to establish fraud.... *Cf. Farmer Coop. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982) (fraudulent intent to conceal assets "may be established by circumstantial evidence, or by inferences drawn from a course of conduct").

To infer fraudulent intent, courts look for specific indicia of fraud. Actions from which fraudulent intent may be inferred include situations in which a debtor conceals prebankruptcy conversions, converts assets immediately before the filing of the bankruptcy petition, gratuitously transfers property, continues to use transferred property, and transfers property to family members. Courts also consider the monetary value of the assets converted in determining whether the debtor acted with fraudulent intent.[4] The cases, however, are peculiarly fact specific, and the activity in each situation must be viewed individually.

[4] Other indicia of fraud include:

> (1) that the debtor obtained credit in order to purchase exempt property; (2) that the conversion occurred after entry of a large judgment against the debtor; (3) that the debtor had engaged in a pattern of sharp dealing prior to bankruptcy; ... and (4) that the conversion rendered the debtor insolvent.

*Id.* at 1077 & n. 4 (citations and quotations omitted). The creditor alleging that a

---

[3]. The bankruptcy court stated: "The parties have raised no issues concerning the law that applies to their disputes. Instead, all the questions before the Court involve determining the facts and then determining the

significance of those facts under the relevant provisions of § 727(a)." Memorandum of Decision at 3, in Appellant's Appendix at 169.

debtor's discharge should be denied has the burden of proving each element of § 727(a)(2)(A) by a preponderance of the evidence. *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997).

■ Cadle argues that the debtors' discharge should be denied under § 727(a)(2)(A) because Rod's prepetition assignment of his interest in a lawsuit, coupled with the debtors' prepetition payments to creditors at a time when they anticipated filing bankruptcy, show that the debtors had the intent to hinder, delay or defraud it. The bankruptcy court disagreed, and, for the reasons stated below, we do not have a definite and firm conviction that the bankruptcy court erred.

Rod, a commercial real estate broker and property manager, became involved in a low income housing real estate deal ("Housing Deal"). He and Duane Wadley ("Wadley"), a real estate developer, were to receive compensation upon completion of the Housing Deal, and another associate, Ken Steffens ("Steffens"), was to obtain a management contract for the property. The Housing Deal failed, and in August 1997, Rod, Wadley, and, possibly, Steffens (who was an employee of Wadley's corporation and Wadley's agent) sued certain individual and corporate defendants seeking damages ("Housing Deal Suit"). Wadley's attorney, Mr. Malone, filed the Housing Deal Suit for the plaintiffs, and, although there was no written agreement, Rod was under the impression that Malone represented him in the Suit.

In January 1998, the state court entered a judgment dismissing the individual defendants from the Housing Deal Suit, and granting judgment in favor of Rod and the other plaintiffs against the corporate defendants. The parties to the Housing Deal Suit understood that the "deep pockets" were the individual defendants who had

been dismissed, and that it was unlikely that the corporate defendants, against whom Rod and the other plaintiffs obtained judgment, would be able to pay the judgment. Wadley filed an appeal of the state court's order dismissing the deep pocket-individual defendants from the Housing Deal Suit, and the corporate defendants filed an appeal of the state court's judgment against them.

At the same time, approximately March 1998, Rod told Wadley that he could not afford to continue to be involved in the Housing Deal Suit. Rod had never paid Malone any fees or been billed for any fees, but Wadley or Steffens had informed him that the fees were at least $60,000 as of the trial date. Although Wadley testified that he had no expectation that Rod would pay any share of the attorney's fees and costs, Rod testified that he believed that he would be responsible for a share of the fees. Rod told Wadley that he would assign his interest in the Housing Deal Suit to Wadley in exchange for a release of any liability for past or future attorney's fees and costs.

Wadley and Rod were later informed that Rod's assignment of his interest the Housing Deal Suit to Wadley needed to be in writing. On May 6, 1998, an assignment agreement was signed by Rod and Steffens, who was acting as Wadley's agent, stating:

> WHEREAS, Stewart, and the other plaintiffs in the [Housing Deal Suit] have an agreement that Stewart is to pay one-third of all attorneys fees and expenses incurred in the Litigation, but to date has been unable to pay his proportionate share; and

> WHEREAS, both parties to this Agreement and Assignment have agreed that there are still potentially substantial expenses in pursuit of the Litigation against the defendants to collect the

judgment received and to pursue and defend appeals, and it is unknown whether any affirmative recovery of the judgment will ever be obtained. Therefore, both parties have agreed that in consideration of Wadley Homes assuming Stewart's share of the Litigation costs, both past and future, Stewart will assign to Wadley Homes his proportionate share of his interest in the Litigation, and any recovery obtained as a result of the judgment obtained in the Litigation.

Agreement and Assignment, in Appellant's Appendix at 528. The assignment agreement also states that it is the entire agreement among the parties.

Just prior to the entry of the judgment in the Housing Deal Suit, Cadle commenced collection of its assigned deficiency judgment against the debtors. At the time that Rod executed the written assignment agreement, therefore, he had been served with Cadle's discovery requests and knew that Cadle was seeking collection of the deficiency judgment. Although Rod testified that he had "hoped" to pay any recovery from the Housing Deal Suit to Cadle, he also stated that he did not consider Cadle when he agreed to assign his interest in the Suit to Wadley. Rather, "[a]ll [he] could think about was squaring things up with people as best [he] could." Transcript at 178, in Appellant's Appendix at 1328.

The record further shows that at about the same time that the assignment agreement was executed, Wadley's agents were working to settle the Housing Deal Suit. Contrary to Cadle's assertions, the testimony is uncontroverted that Rod did not know that these settlement negotiations were taking place when he executed the assignment agreement. Close to the debtors' petition date, Wadley entered into a settlement agreement with a third party purchaser of the Housing Deal property, and he was paid $150,000 thereunder.

■ As the bankruptcy court concluded, these facts do not prove by a preponderance of the evidence that Rod assigned his interest in the Housing Deal Suit to Wadley with an intent to hinder, delay or defraud Cadle. Although the assignment was made at a time when Cadle was seeking collection of its assigned deficiency judgment and when the debtors were contemplating filing bankruptcy, the evidence supports Rod's contention that he assigned his interest in the Housing Deal Suit to minimize his mounting debts related thereto. A transfer made in close proximity to the filing of a bankruptcy petition is not *per se* evidence of fraud. *Brown*, 108 F.3d at 1293; *Carey*, 938 F.2d at 1077. The bankruptcy court's conclusion of lack of fraudulent intent is supported by the fact that Rod fully disclosed the assignment in his bankruptcy case.

Furthermore, the evidence indicates that Rod obtained reasonably equivalent value for the assignment of his interest in the Housing Deal Suit by receiving Wadley's promise to pay his share of the mounting legal fees and expenses. Cadle, relying on pieces of the transcript taken out of context, maintains that the bankruptcy court erred in failing to find fraudulent intent because Rod had no obligation to pay attorney's fees and costs in the Housing Deal Suit. Thus, according to Cadle, the entire assignment was a sham to allow Wadley to be paid instead of Cadle. This allegation is without support in the record or the controlling language of the assignment agreement. Contrary to Cadle's assertions, Wadley's belief that Rod would not be able to pay attorney's fees and costs is not evidence that Rod had no obligation to pay them.

Cadle's case also fails because it did not present any evidence as to why Rod would

want to essentially give his share of the Housing Deal Suit to Wadley to injure Cadle. There is nothing showing that Wadley and Rod had a close personal or business relationship that would have prompted Rod to essentially assign his interest in the Housing Deal Suit to Wadley for no consideration. Although he and Wadley had been business associates on several real estate deals over the years, the testimony was clear that they did not, contrary to Cadle's assertions, have a close, ongoing relationship.

Additionally, other than the debtors' failure to answer Cadle's discovery requests and their admission that they filed for bankruptcy protection in part to avoid answering the discovery requests, Cadle presented no evidence that the debtors harbored any animosity that would have motivated them to hinder, delay or defraud Cadle. Even if Rod had not transferred his interest in the Housing Deal Suit to Wadley, Cadle had no more rights to the proceeds therefrom than any other general unsecured creditor. Cadle contends that any recovery in the Housing Deal Suit was earmarked for it, but this allegation is not supported in any way by the record. Although Rod testified that he "hoped" to use any recovery in the lawsuit to pay Cadle, such "hope" is not proof of a legal obligation to Cadle.

Cadle also argues that Rod's assignment of his interest in the Housing Deal Suit coupled with the debtors' numerous prepetition transfers at a time when they were considering filing for bankruptcy protection demonstrates that the debtors were attempting to pay all creditors, other than Cadle, with nonexempt assets. In conjunction with this argument, Cadle alleges that Rod caused his solely-owned company, Rod M. Stewart Realtor, Inc. ("Realtor"), to make numerous inappropriate prepetition transfers to pay the debtors' personal debts.

The bankruptcy court held that these transfers, together with Rod's assignment of his interest in the Housing Deal Suit, all of which were fully disclosed by the debtors in their bankruptcy case, were not evidence of an intent to hinder, delay or defraud Cadle. It noted that at most, Cadle had shown that some of the transfers were avoidable as preferences, but this did not create fraudulent intent. The court went on to state:

> In sum the Court is convinced that all the transfers Cadle finds objectionable were made for legitimate (or at least understandable) business or personal purposes, and not with the intent to hinder, delay, or defraud the debtors' creditors. At most, a few of the transfers involved technically improper transfers of money from the corporation to pay personal debts, but since [Rod] is the sole shareholder of the corporation, he could have avoided these technical errors and achieved the same result simply by writing himself a corporate check and then paying the bills from his personal account. The Court believes these transfers demonstrate at most poor business practice, not any fraudulent or evil intent. Even considering the transfers cumulatively rather than separately, the Court is not convinced that the debtors acted with the intent required to violate § 727(a)(2)(A).

Memorandum of Decision at 7, in Appellant's Appendix at 173. This conclusion is supported by the record and, therefore, is not clearly erroneous.

### 2. *Section 727(a)(3)*

 Section 727(a)(3) provides that the court "shall grant the debtor a discharge, unless—... (3) the debtor has concealed ... or failed to keep or preserve

any recorded information ... from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under the circumstances of the case[.]" 11 U.S.C. § 727(a)(3). The Tenth Circuit has stated that a prima facie case under this section requires the creditor to show that the debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his [or her] financial condition and *material* business transactions." *Brown,* 108 F.3d at 1295 (emphasis in the original). If the creditor makes such a showing, the burden then shifts to the debtor to justify his or her failure to maintain the records. *Id.* The long-standing rule in the Tenth Circuit is that: "Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them." *Hedges v. Bushnell,* 106 F.2d 979, 982 (10th Cir.1939); *accord Johnson v. Bockman (In re Bockman),* 282 F.2d 544, 546 (10th Cir.1960).

■ Cadle argues that the debtors' discharge should be denied under § 727(a)(3) because they failed to keep and provide sufficient records related to their partnership interest in an entity called "Stewart Properties" and a joint venture known as "Ken Rod." Cadle also contends that the debtors' failure to provide documents related to Realtor, the corporate entity in which Rod was the sole shareholder, until trial is grounds for denial of their discharge under § 727(a)(3). Each of these allegations and the bankruptcy court's conclusions are discussed below.

### A. *Facts Related to Stewart Properties*

Stewart Properties is a partnership between Rod and Deb. Its single asset is a 7,000 square foot building, located in an "economically deteriorating area." In mid–1997, RCA, the building's sole tenant of eleven years, vacated the building, and the partnership was unable to find a new tenant.

Since RCA vacated the building, Stewart Properties has derived no income from the building. The debtors kept financial records related to the building, until they lost RCA as a tenant. Thus, although they produced the documents that they had, the debtors were unable to provide documents related to Stewart Properties after mid–1997.

The entity with a mortgage against the building obtained relief from the automatic stay in the debtors' Chapter 7 case and foreclosed on its mortgage. The Chapter 7 trustee in the debtors' case abandoned the estate's interest in the building.

Based on these facts, the bankruptcy court concluded: "Given the nature of the enterprise and the circumstances, the Court is convinced that the records the debtors kept were sufficient." Memorandum of Decision at 8, in Appellant's Appendix at 174. The bankruptcy court did not err in refusing to deny the debtors' discharge under § 727(a)(3). The debtors produced the documents that they had, and their failure to produce documents after RCA vacated the site was justified given the circumstances. Furthermore, the records that were produced sufficiently identified transactions to allow Cadle and the Chapter 7 trustee to make an intelligent inquiry about Stewart Properties. *Hedges,* 106 F.2d at 982. Based on the documents that were provided, the Chapter 7 trustee abandoned the estate's interest in the building owned by Stewart Properties.

### B. *Facts Related to Ken Rod*

Ken Rod is a joint venture between Rod and Steffens that owns and leases a single

commercial building. Deb is in no way affiliated with this venture. In March 1998, Rod turned over active management of the venture to Steffens. After that time, Rod no longer maintained documentation related to Ken Rod.

The records held by Rod for Ken Rod's pre–1998 operations, which were provided in the bankruptcy court, indicated that Ken Rod's property had not produced sufficient income to meet its expenses for seven years prior to the time that Rod turned it over to Steffens. Rod testified that to the best of his knowledge nothing had changed that would lead him to believe that the finances of the property had changed after he turned over control to Steffens.

Rod and his attorney requested Steffens to turn over documents related to his management of Ken Rod, but Steffens did not turn over any documents. Cadle never attempted to obtain the records from Steffens. The Chapter 7 trustee abandoned the estate's interest in the joint venture.

The bankruptcy court, concluding that the debtors' failure to turn over post 1997 Ken Rod's records was justified, stated that: (1) the venture had been unprofitable over a long period of time; (2) the trustee had abandoned the property; (3) Rod was aware of no change that would have improved the venture's financial situation; and (4) Steffens did not voluntarily supply the venture's records, and Cadle did not attempt to force him to do so. These conclusions are supported by the record and are not clearly erroneous.

Cadle argues that any failure to provide documents is grounds for denial of a discharge under § 727(a)(3). However, the plain language of the statute says that the bankruptcy court may excuse a failure to provide or keep documents under the appropriate circumstances. Here, the debtors argued that their failure to keep records was justified, and the bankruptcy court agreed. There is no clear error in its decision.

### C. Facts Related to Realtor

Cadle maintains that the debtors' failure to provide Realtor's financial documents until trial is grounds for denying their discharge under § 727(a)(3). The bankruptcy court granted Cadle's motion to allow the fact that Realtor's records were not produced until trial to be considered as grounds for denying the debtors' discharge under § 727(a)(3), but it made no specific ruling on this point in its Memorandum of Decision. The only conclusion that can be reached is that the bankruptcy court rejected Cadle's argument. We concur because Realtor's documents were produced, and all parties had an opportunity to review and comment on them prior to issuance of the bankruptcy court's Judgment. Indeed, based on the documents that were produced, Cadle provided a reconciliation of accounts to the bankruptcy court. Its contention, therefore, that the debtors failed to keep records on which their financial condition could be determined is without merit.

### 3. Section 727(a)(4)(A)

Section 727(a)(4)(A) provides that: "The court shall grant the debtor a discharge, unless—... (4) the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account[.]" 11 U.S.C. § 727(a)(4)(A). In *Brown*, the Tenth Circuit stated:

> In order to deny a debtor's discharge pursuant to this provision, a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact. It is undisputed that [the debtor] made incorrect entries on his bankruptcy

schedules and that he made oaths upon them. Therefore, the crux of the dispute is whether the oaths were knowing and fraudulent and relate to a material fact. We need not decide whether the oaths were related to material facts because we conclude from the record that the oaths were not knowing and fraudulent.

A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence. Moreover, an honest error or mere inaccuracy is not a proper basis for denial of discharge.... The fact that a debtor comes forward with omitted material of his own accord is strong evidence that there was no fraudulent intent in the omission.

108 F.3d at 1294–95 (citations omitted); *accord In re Calder,* 907 F.2d 953, 955 (10th Cir.1990).

Cadle claimed below that the debtors made a false oath because their schedules understated the value of their jewelry and household goods, failed to list a number of active real estate listings as assets, and understated their income. The bankruptcy court rejected these claims. On appeal, Cadle only objects to the bankruptcy court's treatment of the real estate listings and the debtors' alleged understated income. Each is discussed below.

### A. *Omitted Real Estate Listings*

 Realtor, a corporation, held several real estate listings on which Rod was the broker or agent. These listings were not disclosed as assets in the debtors' schedules. Cadle claims that the debtors disregarded the legal separateness of Realtor prior to filing Chapter 7 and, therefore, they should have ignored it in bankruptcy, including all of Realtor's assets as their assets. Their failure to do so, Cadle argues, constitutes a false oath.

The bankruptcy court correctly rejected this argument, stating:

In effect, Cadle seems to claim that Mr. Stewart should have "pierced the corporate veil" of his own corporation on his own initiative. The Court is not familiar with such a practice and does not believe debtors must follow it in preparing their bankruptcy schedules.... The evidence supported the debtors' claim that the listings were owned by Realtor, and Cadle did not really contest that fact. The Court is convinced that the debtors adequately disclosed the listings by disclosing their ownership of Realtor. Not including the listings in the schedules did not amount to a knowing and fraudulent false oath.

Memorandum of Decision at 11–12, in Appellant's Appendix at 177–78.

On appeal, Cadle states that the debtors failed to provide any evidence to support their contention that the real estate listings belonged to Realtor. This argument is unpersuasive, because it is Cadle, not the debtors, who had the burden to produce such evidence. Cadle points out that Rod testified that he was the broker on the property, and one of the listing agreements shows that Rod was the broker. These facts, which are an accurate representation of the evidence, do not prove, however, that Rod owned the listing. Accordingly, the alleged omission of real estate listings from the debtors' schedules does not constitute a false oath.

### B. *Undisclosed Income*

 Cadle argues that Schedule I, stating the debtors' current income, shows gross monthly income of $4,735. It claims that this is a material misstatement because this sum times twelve months only amounts to approximately $57,000 annual income. Because the debtors' actual income in 1997 was in excess of $200,000,

Cadle maintains that this statement is materially false.

Cadle's argument is without merit. The Schedule I requires the debtors to state their "current" income. It is reasonable to believe that the debtors' income in May of 1998 when they filed their Chapter 7 petition was less than what the debtors earned in 1997. This point is supported by the income listed in the debtors' statement of financial affairs, which shows that Rod's income as of June 1998 was substantially less than it had been in 1997. The debtors' income in 1996 was also significantly less than what they earned in 1997. In any event, although a knowing and material omission in a debtor's statement of financial affairs or schedules is grounds for denial of a discharge under § 727(a)(4)(A), *Calder*, 907 F.2d at 955, comparison of Schedule I, which measures current income, with income reported for past years in the statement of financial affairs is not, standing alone, a basis on which to find a false oath.

#### 4. *Section 727(a)(5)*

Section 727(a)(5) provides: "The court shall grant the debtor a discharge, unless—... (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]" 11 U.S.C. § 727(a)(5). A party objecting to a debtor's discharge under § 727(a)(5) has the burden of proving facts establishing that a loss or shrinkage of assets actually occurred. However, once the objecting party meets its initial burden of proof, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner. *United States v. Dorman (In re Dorman)*, 98 B.R. 560, 571 (Bankr.D.Kan.1987).

Cadle contends that the debtors did not account for the use of their 1997 income.

The bankruptcy court required the parties to submit post-trial memoranda on this issue. Both parties filed reconciliations of the debtors' income and expenses. In their reconciliation, the debtors accounted for all of their income and expenses. Cadle's reconciliation, on the other hand, shows that the debtors failed to account for $22,000 of income. Both parties' reconciliations are based on the same information; the differences in the results are due to the accounting methods used. In its Memorandum of Decision, the bankruptcy court states that it conducted an independent evaluation of the materials, and that, although both had errors, it concluded that the debtors had made a satisfactory explanation of the use of their 1997 income. Our review of the pleadings leads to no definite and firm conviction that the bankruptcy court erred.

### III. *Conclusion*

For the reasons stated above, the bankruptcy court's Judgment is AFFIRMED.