**In re David Keith MORRIS, Debtor.**

**H.L. and Elaine Crane, Plaintiffs,**

**v.**

**David Keith Morris, Defendant.**

**Bankruptcy No. 01–03119–M.
Adversary No. 01–0368–M.**

United States Bankruptcy Court,
N.D. Oklahoma.

Dec. 17, 2003.

---

1. The Court's staff attorney has not participated in any aspect of the trial and decision of this adversary proceeding.

James E. Wallace, Grove, OK, for Plaintiffs.

Mark R. Reents, Tulsa, OK, for Defendant.

## MEMORANDUM OPINION

TERRANCE L. MICHAEL, Chief Judge.

The issue before the Court is whether David Keith Morris ("Debtor" or "Morris") should be granted a discharge in his underlying bankruptcy case. Two of his creditors, H.L. Crane and Elaine Crane ("Plaintiffs" or "Cranes"), contend that Debtor has engaged in conduct which should preclude the discharge of his debts. The parties spent three full days presenting their positions to the Court. The Court has reviewed the evidence presented and the written closing arguments submitted on behalf of the parties. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(J).

### Burden of Proof

 Plaintiffs contend that Morris' discharge should be denied under § 727(a)(3), (a)(4) and/or (a)(5). In order to prevail under any of these sections, Plaintiffs must prove each element by a preponderance of the evidence.[2] In order to further the policy under the Bankruptcy Code of providing a debtor with a "fresh start," all objections to discharge "should be construed strictly against the creditor and liberally in favor of the debtor."[3]

### Findings of Fact

Morris is engaged in the residential construction industry. Prior to May 25, 2001, Morris operated as a sole proprietorship under the name "Grand Lake Builders." He is a high school graduate with little, if any, financial acumen. He is unsophisticated in the areas of accounting or business management. In his own words, even though he is the chief executive officer of more than one business venture, Morris "drives nails for a living." He relies upon his bank to keep his financial records (through the use of a checking account), and relies upon his accountant to calculate his tax liabilities and prepare his tax returns.

Sometime in 1996, Morris entered into a contract with the Cranes for the construction of a custom home. Disputes arose between the Cranes and Morris. Those disputes ended up in litigation in the District Court in and for Delaware County, Oklahoma (the "State Court"). On May 23, 2001, the State Court entered judgment (the "Judgment") against Morris and in favor of the Cranes in the amount of

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2003). All other references to federal statutes and rules are also to West 2003 publications.

2. *See* Fed. R. Bankr P. 4005; *see also First Nat'l Bank of Gordon v. Serafini (In re Serafini),* 938 F.2d 1156, 1157 (10th Cir.1991); *cf. Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

3. *In re Juzwiak,* 89 F.3d 424, 427 (7th Cir. 1996).

$170,840.15.[4] To date, the Judgment remains unpaid.

On May 25, 2001, two days after entry of the Judgment, Morris and his wife formed Grand Lake Builders, Inc., an Oklahoma corporation ("GLBI"). Morris testified that the purpose behind the formation of GLBI was to allow his construction business to continue operation without fear of having funds provided by new customers for future projects becoming subject to execution efforts to satisfy the Judgment. The shareholders of GLBI included Morris and his wife.

Morris also held an interest in a corporation named Grand Country Investments, Inc. ("GCI"). GCI was formed in 1996. Morris was the President of GCI. Shareholders in GCI included Morris, his wife, Robert W. Evenson, and Dee Anne Evenson.[5] GCI was incorporated for the purpose of marketing residential real estate. On September 3, 1996, the shareholders of GCI entered into an agreement (the "GCI Agreement") which contained the following provisions:

**8. Valuation of Stock; Payment.** The value of each share of stock shall be determined by the Shareholders, from time to time, by agreement.

In absence of the agreement of value, the value of the stock shall be its book value as between the original shareholders as set forth in Section 9.

The book value of the assets of the Corporation shall be determined by an independent accountant in accordance with generally accepted accounting principles and shall be made as of the end of the last accounting period of the Corporation prior to the happening of the event causing the transfer or proposed transfer, except that the value of the inventories, supplies, and similar tangible assets, and of accounts receivable in the ordinary course of business, shall be as of the date of the happening of the event causing the transfer or proposed transfer.

The good will of the Corporation shall not be treated as an asset unless all Shareholders agree in writing to the value thereof for the purposes of book value. In the event of a transfer under Section 9 of this Agreement, the event giving rise to the transfer or proposed transfer shall be the delivery of notice of desire to sell or transfer by the selling shareholder.

9. In the event of levy or execution on the stock of any shareholder, or if the shareholder declares himself to be insolvent, or bankrupt, or any other action occurs which could result in the transfer or sale of the stock to a third party (a person who is not one of the original shareholders), then the remaining shareholders shall have the right to buy that shareholder's stock at par value.[6]

At all times relevant hereto, the par value of the GCI stock owned by Morris was $500.00. At no time did the stockholders ever agree in writing to a different valuation of the stock, nor did they ever waive the provisions of paragraph 9 of the GCI Agreement.[7]

---

4. See Pls.' Ex. 98.

5. Mr. Evenson is Morris' brother-in-law and is a licensed attorney.

6. Def.'s Ex. 25–3.

7. The validity of this provision was the subject of litigation in Morris' bankruptcy case. Mr.

and Mrs. Evenson sought to compel the Chapter 7 Trustee to abandon Morris' interest in the GCI stock on the basis that it was of little or no value to the estate. See Case No. 01–03119–M, Docket No. 23. Patrick J. Malloy III ("Malloy"), the trustee in the case, opposed the motion, arguing that he was not bound by the shareholder agreement, and that

GCI acquired 47 lots in an unplatted development in Delaware County, Oklahoma. In order to purchase these lots, GCI borrowed funds from Grand Federal Savings Bank ("Grand Federal"). Between 1996 and July 10, 2001, GCI sold a number of the lots. As of July 10, 2001, GCI owned between 18 and 22 lots. The lots which have been sold were sold for prices ranging between $5,000.00 and $7,000.00 per lot. As of July 10, 2001, GCI owed Grand Federal approximately $50,000.00, which was secured by liens on the remaining lots. Morris testified that he believed that the remaining lots had a value of between $4,000.00 and $5,000.00 each. On the basis of the evidence presented at trial, it appears that Morris supplied the Cranes with copies of the deeds showing sales of lots from GCI to various individuals. In some instances, those individuals contracted with GLBI for the construction of homes; those contracts were also produced. On at least one occasion, a "spec house" was built by Morris on a lot previously owned by GCI.[8]

Morris also had a personal banking relationship with Grand Federal. On at least three occasions, Morris and his wife submitted loan applications to Grand Federal.[9] The loan applications included statements of the assets and liabilities of Morris and his wife. These applications were completed by David Shero, a loan officer for Grand Federal. The information contained in the loan applications came from information supplied by Morris and his wife and the records of the Bank. The loan applications listed, among other things, the following assets:

| Asset | Value |
| --- | --- |
| Business | $180,000.00 |
| Cattle | 6,000.00 |

The business was Grand Lake Builders, the Debtor's sole proprietorship. With respect to the cattle, Morris testified that at no time did he ever own cattle. The cattle listed on the financial statements were owned by Morris' father-in-law. Morris admitted that the cattle never should have been included in the financial statements submitted to Grand Federal. Morris' father-in-law is now deceased. Any remaining cattle are owned by Morris' wife and/or are held in trust for the children in the Morris household. Two of the financial statements also listed life insurance with a face value of $250,000.00 and a cash value of zero.[10] Morris testified that any life insurance which he had during the time period in question was term life insurance which had no cash value.

The Court was provided with the profit and loss statement submitted by Morris as part of his federal income tax return for calendar year 2000.[11] In that schedule, Morris listed inventory at year end (December 31, 2000) of $128,200.00. Morris was questioned regarding the inventory figure. According to his testimony, as of December 31, 2000, Morris was in the process of completing construction of a house for a Ms. Naomi Rogers ("Rogers").

---

the Debtor's stock in GCI had some value. *See id., Docket No. 27.* The Court held for Malloy, and refused to order the abandonment. *See id., Docket No. 36.*

8. A "spec house" is a house built without a buyer. The purposes behind the construction of a "spec house" include providing an example of the style and quality of homes to potential purchasers (i.e. *de facto* advertising) as well as having a home available for purchase by someone who does not wish to endure the time and effort of construction and is satisfied that the "spec house" will meet his or her needs as an abode.

9. *See Pls.' Exhs.* 5, 6, and 7.

10. *See Pls.' Exhs.* 6 & 7.

11. *See Pls.' Exhs.* 9.

Although he was a bit unsure in his testimony, Morris believed that the only items which could be represented by this inventory figure were the Spec House and inventory on hand relating to the construction of the Rogers home. The real estate upon which the Rogers home was constructed was conveyed to Rogers on July 17, 2000.[12] The contract for the Rogers home was entered into on November 1, 2000.[13] These facts support the explanation given by Morris regarding the inventory figure.

In late May and early June of 2001, Morris and his wife entered into two transactions regarding the sale of motor vehicles. They sold a 1989 Ford Pick–Up Truck to Donald and Patsy Stephens for the sum of $3,000.00. In addition, as part of the purchase of a new 2001 GMC Pick–Up Truck, they sold a 1999 GMC Truck to Cheek Auto Mall in Miami, Oklahoma. Morris and his wife were credited with $10,478.00 on the sale of the 1999 GMC. Of that amount, $4,478.00 was applied as a down payment on the 2001 GMC, and the balance of $6,000.00 was taken in cash. From this $6,000.00, $1,200.00 was paid to Morris' bankruptcy counsel for payment of attorney and filing fees in his Chapter 7 case, $800.00 was given to his wife for the payment of household expenses, and the balance of $4,000.00 was deposited into the GLBI account. The latter monies were used in the operation of the business; included in the sums paid was $2,246.00 in taxes and licensing fees on the 2001 GMC.[14]

On or about June 4, 2001, GLBI entered into a contract with Bill Self and Jeanne Self (the "Selfs") for an addition to the Selfs' residence.[15] The total cost for the addition under the terms of the contract was $27,648.00. At the time the contract was executed, the Selfs paid $7,000.00 in the form of a check made payable to Morris individually. Rather than deposit that check, Morris cashed it, and used the proceeds to pay for labor and materials on the Self project. Morris testified that he did not deposit this check in a financial institution for fear that the funds might be garnished by the Cranes, thus undercutting his ability to perform the Self contract. On June 22, 2001, the Selfs paid $10,000.00 in the form of a check made payable to Morris individually. Morris caused this check to be deposited in the corporate account of GLBI. These funds were also used to complete the Self contract. The expenditure of those funds is detailed in the checking account records of GLBI.[16] The Debtor testified that the Self contract was fully completed without incident, and that no construction or materialmen's liens ever attached to the Self property as a result of this project.

Morris filed a petition for relief under Chapter 7 of the Bankruptcy Code on July 10, 2001. His wife is not a debtor. In his schedules, Morris listed assets of $293,590.00 and liabilities of $475,715.65.[17] The total amount of secured debt was $282,974.50, of which $219,409.00 was held by Grand Federal. The Cranes were scheduled as holding $170,840.15 out of a total of $191,841.15 in unsecured debt.

In the schedules, Morris valued his interest in GCI at $500.00. He listed no cattle. His Schedules I and J show monthly income of $4,375.00, and monthly

12. *See Def.'s Ex. 106.*

13. *See Def.'s Ex. 108.*

14. *See Def.'s Ex. 162.*

15. *See Pls.' Exh. 15.*

16. *See Def.'s Exhs. 162 and 163.*

17. *See Def.'s Ex. 2.*

expenses of $6,808.00. He also lists the value of his interest in GLBI as $500.00. Other assets include:

| Asset | Value |
| --- | --- |
| Homestead | $125,000.00 |
| Rental House | 26,500.00 |
| Spec House | 95,000.00 |
| Household Goods | 1,150.00 |
| 2001 GMC Truck | 31,000.00 |
| Boat | 6,000.00 |
| Tractors | 7,000.00 |
| Waverunner | 500.00 |

The schedules indicated that Morris had no interest in any life insurance policies at the time he sought bankruptcy protection. Morris testified that he had allowed all of his life insurance to lapse prior to the filing of his bankruptcy case.

In addition to the scheduled assets, Morris disclosed in his statement of affairs that he was holding certain property for the benefit of other people. Specifically, Morris disclosed that he was holding deposits of money made by two individuals for whom Morris (or GLBI) had agreed to perform construction work. Morris also disclosed that he had received $375.00 per month in rental income from real estate.[18] At trial, Morris disclosed that he held certain property for his 15 year old stepson and that he held a second waverunner as collateral for a debt owed to him by a third party. The second waverunner was returned upon payment of the debt owed.

At trial, Morris testified that he made an effort to assemble all of his books and records in response to discovery requests propounded by the Cranes. Morris testified that he kept most of his records loosely assembled in boxes. At least one of these boxes was not located. Morris testified that he did not intentionally destroy any of his records; his best explanation for the loss of records was that they had been inadvertently discarded by his stepson.

The Court finds Morris' testimony on this subject to be both uncontroverted and credible.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

### Conclusions of Law

In order to understand the ruling of the Court, some procedural context must be provided. It took over two years for this case to proceed to trial. The file is replete with discovery disputes, motions for sanctions and costs, and requests for extensions of time. The process of submission of a pre-trial order was so bitterly contested that the Court was required to sequester counsel in a room at the courthouse and direct them not to emerge until a pre-trial order was completed. Even after such herculean efforts, the pre-trial order which was presented to the Court remained somewhat vague in its framing of the issues to be tried.

Trial did little to focus the issues. Instead, counsel for the Plaintiffs engaged in what seemed to be an endless "fishing expedition," asking Debtor the same questions again and again over a two and one-half day period, apparently in the hopes of obtaining inconsistent answers or an answer which would propel his case forward. In order to bring some semblance of focus to the matter at hand, the Court entered an order on October 31, 2003, which provided that:

> Counsel for Plaintiffs is hereby put on notice that the Court expects the written closing argument submitted by said counsel to:
>
> 1. Identify each issue in the pre-trial order which Plaintiffs continue to advance;

---

18. *See Def.'s Ex. 6–13–14.*

2. Identify all evidence upon which Plaintiffs rely in support of each issue, on an issue-by-issue basis;

3. Include citations to all authority which Plaintiffs ask the Court to consider in support of their position;

4. Identify any issues listed in the pre-trial order which are no longer being advanced by the Plaintiffs; and

5. Specifically identify the relief which Plaintiffs seek.

Any matters which are not argued in accordance with these requirements shall be deemed abandoned by the Plaintiffs. Defendant is not required to submit argument on any matters which are abandoned by the Plaintiffs.[19]

The closing argument submitted by the Plaintiffs touches on only a limited portion of the evidence presented. The Court will be true to its word and examine only those arguments and only those facts outlined by counsel for the Plaintiffs in his written closing argument. All other possible arguments which could have been made under the pre-trial order are deemed abandoned. To act otherwise would place the Court in the untenable position of advancing arguments on behalf of the Plaintiffs.

### Section 727(a)(3)

■ The Cranes contend that Morris should be denied a discharge under § 727(a)(3), which provides that

The court shall grant the debtor a discharge, unless-

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.][20]

The United States Court of Appeals for the Tenth Circuit has held that in order to sustain a claim under this section, the party seeking denial of discharge must establish that the debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material business transactions*."[21] It is also established in this circuit that "[r]ecords need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them."[22]

■ Factors which a court may take into account when determining the sufficiency of disclosures include:

1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;

2. The amount of the debtor's obligations;

3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;

4. The debtor's education, business experience and sophistication;

---

19. *See Docket No. 52.*

20. § 727(a)(3).

21. *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1295 (10th Cir.1997) (emphasis in original) (citation omitted).

22. *Hedges v. Bushnell,* 106 F.2d 979, 982 (10th Cir.1939); *cited with approval in Cadle Company v. Stewart, (In re Stewart),* 263 B.R. 608, 615 (10th Cir. BAP 2001); *see also Henkel v. Green (In re Green),* 268 B.R. 628, 647 (Bankr.M.D.Fla.2001) (same).

5. The customary business practices for record keeping in the debtor's type of business;

6. The degree of accuracy disclosed by the debtor's existing books and records;

7. The extent of any egregious conduct on the debtor's part; and

8. The debtor's courtroom demeanor.[23]

The decision as to whether the books and records provided are sufficient is to be made on a case by case basis, and is a matter left to the discretion of the bankruptcy court.[24] Some courts have held that the bankruptcy court has the discretion to allow the entry of a discharge even if grounds for its denial are found.[25]

■■ In this case, Morris, although he ran a business, can hardly be described as a businessman. He has a high school education. He relies upon others, most notably his banker and his accountant, to manage his financial affairs. He appears to operate his business on the basis of its checking account. There is no evidence that records were intentionally withheld or destroyed. There is also no evidence which would show that the financial records which were provided were somehow misleading or falsified. The Court has no evidence with which to compare the record keeping practices of Morris with similarly situated sole proprietors in Delaware County, Oklahoma. Morris' demeanor during his two and one-half day ordeal on the witness stand left the Court with the belief that he was a believable although highly unsophisticated witness. The Court, after completing its review of the records of Morris which were offered and received into evidence, believes that they are sufficient to allow a creditor to ascertain Morris' financial condition, as well as the material business transactions which he engaged in.

In closing argument, the Cranes contend that the records kept by Morris were deficient in the following respects:

1. They failed to sufficiently allow tracing of the $6,000.00 in cash received as part of the transaction involving the 1999 GMC Truck;

2. They failed to sufficiently allow for tracing of the $7,000.00 and $10,000.00 payments made by the Selfs;

3. They failed to allow for tracing of the alleged interest in cattle valued at $6,000.00 on the financial statements given to Grand Federal;

4. They failed to explain how the value of his sole proprietorship declined from $180,000.00 (a figure found in the Grand Federal financial statements) to zero;

5. They failed to explain the source of the inventory figure of $128,200.00 contained in Morris' 2000 individual tax return; and

6. There were no records which allowed the Cranes to determine the accuracy of the estimated expenses set forth on Schedule J.

The Court finds no merit in any of these contentions. The checking account records submitted by Morris trace all but $800.00 of the $6,000.00 received for the

**23.** *State Bank of India v. Sethi (In re Sethi),* 250 B.R. 831, 838 (Bankr.E.D.N.Y.2000) (citation omitted).

**24.** *Id.*

**25.** *Union Planters Bank, N.A. v. Connors,* 283 F.3d 896, 901 (7th Cir.2002) (citation omitted); *Miami Nat'l Bank v. Hacker (In re Hacker),* 90 B.R. 994, 998–99 (Bankr.W.D.Mo. 1987); *Citizens Bank of Jonesboro v. Anglin (In re Anglin),* 89 B.R. 35, 36 (Bankr.W.D.Ark. 1988).

1999 GMC Truck.[26] The $800.00 was spent on household expenses; certainly the records produced allow the Cranes to conduct intelligent inquiry as to these matters.

With respect to the monies paid by the Selfs, the uncontradicted testimony is that the Selfs contracted with GLBI, a corporate entity, not Morris as an individual. The $10,000.00 payment was deposited into the GLBI checking account; a cursory review of the records of that account allows one to see the disposition of those funds. With respect to the $7,000.00 payment, Morris testified that the funds were spent to complete the Self project. The fact that the project was completed without incident or the placing of any liens upon the Self property is evidence of the truth of those statements.[27]

With respect to the alleged interest in cattle, Morris denied that he ever owned cattle, and admitted that the listing of the cattle on the Grand Federal financial statement was an error. There was no evidence adduced which would indicate that Morris' denial of ownership of cattle was false or fraudulent. If Morris never owned the cattle, one is left to ponder what documents he is supposed to possess to demonstrate this fact. With respect to the valuation of his business in the Grand Federal financial statements, according to Morris the value was based upon goodwill. The Court is at a loss to understand what documents the Cranes believe should exist to substantiate a claim of goodwill. Final-ly, turning to the inventory figure of $128,000.00 contained in the tax returns, the vast majority of this figure was comprised of the Spec House, the whereabouts of which have been fully documented. The explanation regarding the Rogers house being included in the inventory on the 2000 tax return is supported by the record.

The most unique argument advanced by Plaintiffs relates to the schedule of monthly expenses submitted by Morris. Plaintiffs contend that they are unable to trace expenses from the records submitted by Morris to his schedule of expenses.[28] Plaintiffs provide the Court with no detail regarding their allegations. In accordance with the terms of its October 31, 2003, order, the Court does not intend to perform its own forensic accounting of the records submitted in order to determine whether the broad allegations of the Plaintiffs may contain a scintilla of merit. A cursory review of the checking account records entered into evidence reveals that checks were written for items such as food, utilities and vehicle loan payments. Such a review is sufficient in light of the Plaintiffs' failure to place any meat on the bare bones of their argument.

In addition, the argument regarding the schedule of monthly expenses misses the purpose behind the inclusion of schedules of monthly expenses. By definition, the schedule is to be completed "by estimating the average monthly expenses of the debtor and the debtor's family." [29] Debtors

---

26. *See Def.'s Exs. 162 and 163; see also pp.* 733 – 734 *supra.*

27. In addition, to the extent the Cranes take issue with the completeness of the corporate records of GLBI, any issues with respect to those records are not grounds for denial of Morris' individual discharge. *See Barthlow v. More (In re More),* 138 B.R. 102, 105 (Bankr. M.D.Fla.1992).

28. At page 4 of their closing argument, the Cranes refer to 25 separate exhibits (the checking account records offered and received into evidence) and state that these records fail "to show any records upon which Defendant/Debtor could claim actual expenditures relating to payments... [.]" *Pls.' Closing Argument at 4.*

29. *See Pls'. Ex. I–19.*

are further instructed to "[p]ro-rate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate."[30] Therefore, on its face this schedule is both an estimate and an average. It is not a statement of hard and cold fact. The reasons for this are obvious. The Court truly doubts that *anyone* spends the exact same amount each month on living expenses such as food, utilities and medical expenses. Plaintiffs have failed to demonstrate how the estimates contained in the schedule are false or misleading, nor have they shown how the information contained therein prejudiced Plaintiffs in their quest to understand the financial affairs of Morris. The Court finds no basis for denial of Morris' discharge under § 727(a)(3).

### Section 727(a)(4)

▪ Section 727(a)(4) of the Code provides that a discharge may be denied where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[31] The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that

complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[32]

The Fourth Circuit has held that

> In order to be denied a discharge under this section [§ 727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[33]

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4).[34] Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case."[35] At least one court

---

**30.** *Id.*

**31.** § 727(a)(4)(A). This entire paragraph is taken *verbatim* from *Woolman v. Wallace (In re Wallace)*, 289 B.R. 428, 433–34 (Bankr. N.D.Okla.2003) (hereafter *"Wallace"*), a prior decision of this judge.

**32.** *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987) (citations omitted).

**33.** *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir.1987) (citations omitted); *see also Gullickson v. Brown, supra,* 108 F.3d at 1294 ("In order to deny a debtor's discharge pursuant to this provision, a credi-

tor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.").

**34.** *See Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir.1990).

**35.** *Id.* at 955–956. Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2). The United States Court of Appeals for the Seventh Circuit has held that

> [t]o find the requisite degree of fraudulent intent, the court must find the debtor know-

has noted that "[w]here assets of some substantial value are omitted from the schedules, the conclusion that they were omitted purposefully with the fraudulent intent to conceal the assets in question may be warranted." [36]

■ The United States Court of Appeals for the Tenth Circuit has given us further guidance in the interpretation of § 727(a)(4). It has held that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence." [37] We have also been instructed that "an honest error or mere inaccuracy is not a proper basis for denial of discharge." [38] The Court is bound by these pronouncements.

■ The Cranes contend that Morris submitted a false oath when he valued his interest in GCI at $500.00, the par value of his stock. The Court finds no merit in this argument. Morris did not conceal his ownership interest in the GCI stock; the stock was listed in the schedules. The value of the stock was based upon an agreement between the shareholders which stated that if any of the shareholders sought the protection of the bankrupt-

cy court, the other shareholders had the right to purchase his or her shares at par value. At the time the schedules were submitted, Morris had no reason to know that this Court, after litigation on the issue, would find that clause to be invalid. There is no evidence that Morris intended to defraud anyone through his valuation of the stock; indeed, if he had intended to conceal the value of the stock, he would not have scheduled it at all. The Court finds that the valuation of the GCI stock at $500.00, although proven to be legally incorrect, was not done in bad faith or with the intent to defraud creditors, and does not constitute grounds for denial of Morris' discharge.[39]

■ The Cranes also contend that Morris issued a false oath when he valued his interest in GLBI at $500.00. They point to the fact that Morris had valued his sole proprietorship interests at $180,000.00 in financial statements to Grand Federal and to the fact that a tax return submitted on behalf of Morris for the time period ending December 31, 2000, showed inventory on hand of $128,200.00. With respect to the business valuation, Morris explained

ingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud. The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied. The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct. Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.
*In re Yonikus,* 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted); *see also Kaler v. Olmstead (In re Olmstead),* 220 B.R. 986, 994 (Bankr.D.N.D.1998) (quoting *Yonikus*); *see also Rezin v. Barr (In re Barr),* 207 B.R. 168, 176 (Bankr.N.D.Ill.1997) (fraud "may be

proven by evidence that Debtors were aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

36. *Crews v. Topping (In re Topping),* 84 B.R. 840, 842 (Bankr.M.D.Fla.1988) (citation omitted).

37. *Gullickson v. Brown, supra,* 108 F.3d at 1294 (citation omitted).

38. *Id.* at 1295 (citation omitted).

39. Plaintiffs also spend considerable time in arguing that the assets owned by GCI had a value in excess of $100,000.00. Given the Court's conclusion that the stock valuation of $500.00 had a reasonable basis in the shareholder's agreement, the Court need not consider the issue further.

that the valuation was based almost entirely on goodwill and was given prior to the entry of judgment in favor of the Cranes. Assuming for purposes of argument that Morris' business did have a value of $180,000.00 (more or less) prior to the entry of judgment in favor of the Cranes, a judgment of almost $171,000.00 would mathematically deplete any net worth. Morris also testified that his business declined as a result of the judgment, which could easily account for any additional loss of net worth. There is no dispute that Morris disclosed both the existence and the nature of his business. The Court finds no intent to defraud from the mere fact that the Cranes disagree with the Debtor's valuation.

With respect to the inventory valuation of $128,000.00, Morris testified that: (1) said inventory figure was derived by his accountant; (2) included in that inventory was the Spec House which was valued at not less than $95,000.00, and inventory which was incorporated into the Rogers house sold by Morris prior to the filing of his bankruptcy case; and (3) at the time he filed bankruptcy, he had no "inventory," other than the Spec House which was properly scheduled. Once again, the Court is hard pressed to find either a false statement or an intent to defraud. The vast majority of the inventory (the Spec House) was scheduled; in addition, the Cranes offered no evidence to support their allegation that Morris held inventory at the time of the bankruptcy filing which was not scheduled. Although the Cranes argue that "[t]he totality of the circumstances and the number of omissions and/or false oaths clearly support a finding of fraudulent intent," [40] they fail to identify those facts which allegedly demonstrate Morris' scienter. The Court concludes that the facts of this case do not support a finding of fraudulent intent with respect to the scheduling of assets.[41]

In support of their position regarding these alleged false oaths, Plaintiffs rely heavily upon this Court's decision in *Wallace*. Given the factual differences between the two cases, such reliance is misplaced. In *Wallace*, the party seeking to deny the debtor's discharge on the basis of a false oath provided overwhelming evidence that the debtor had provided false testimony to the bankruptcy court on at least one occasion.[42] Here, the Court is

---

**40.** *See Pls.' Closing Argument at p. 6.*

**41.** At page 9 of their closing argument, Plaintiffs make a sweeping statement to the effect that Morris "omitted to list numerous significant assets of substantial value which surely warrants the conclusion that they were omitted purposely with fraudulent intent to conceal the assets in question." *See Pls.' Closing Argument at 9.* This general statement is not accompanied by any detail as to the allegedly omitted assets. Therefore, the argument runs directly contrary to the instructions given to the parties regarding closing argument. The Court will not attempt to ferret out the assets which Plaintiffs allege were hidden.

**42.** As the Court noted in *Wallace,*
 In the present case, Plaintiffs have pled in great detail the false oaths advanced by Wallace. On not less than four separate occasions, Wallace has made a statement under oath regarding the accuracy of his schedules and statement of affairs. When he initially signed them, he did so under penalty of perjury. Shortly thereafter, he testified under oath before Judge TeSelle that his schedules were prepared with his assistance and input and that they were true and correct to the best of his knowledge and belief. Later, before this judge, Wallace testified that his schedules were inaccurate and prepared without his input. He made the same manner of statement under oath at his first meeting of creditors with Malloy as trustee. Either the schedules and statement of affairs were accurate and prepared with Wallace's input or they were not. Wallace has testified to both propositions. Not only did the Plaintiffs plead these facts with specificity, they provided ample evidentiary support for these

being asked to infer the falsity of schedules.[43] The Court declines to do so.

### Section 727(a)(5)

■ Finally, Crane asks this Court to deny Morris a discharge under § 727(a)(5), which provides that:

(a) The court shall grant the debtor a discharge, unless-

\* \* \* \* \* \*

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets or to meet the debtor's liabilities[.][44]

In order to deny a debtor's discharge under § 727(a)(5), a creditor must prove facts that establish loss or reduction of the debtor's assets by a preponderance of the evidence.[45] Once a creditor meets its burden of proof, "the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactorily manner."[46] One court had ruled that

> allegations at the hearing on the Application. The conclusion that Wallace has made a false statement under oath is inescapable.
>
> *Wallace, supra,* 289 B.R. at 434–35. It is difficult to fathom a more compelling instance of a false oath than the one found in *Wallace.*

Although the explanation does not need to be comprehensive, it must meet two criteria in order to be deemed satisfactory. First, it must be supported by at least some documentation. Second, this documentation must be sufficient to eliminate the need for the Court to speculate as to what happened to all the assets.[47]

Courts have universally rejected "[v]ague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation[.]"[48]

■ In an unpublished decision, this Court has found that

> The purpose behind § 727(a)(5) is to ensure that creditors, the trustee and the Court are provided a clear picture of debtor's financial transactions and activities prior to bankruptcy. Absent such a requirement, a debtor could intentionally cloud his or her financial affairs and eliminate any potential liability for wrongful or fraudulent conduct. Such was not the intent of Congress when it drafted § 727 of the Bankruptcy Code.

43. *See Pls.' Closing Argument at 8.* At least one of the contentions made by the Plaintiffs appears to be inaccurate. Plaintiffs claim that Morris "failed to list any financial statements that he made to financial institutions." *Id.* The only financial statements given by Morris which were received into evidence were financial statements given to Grand Federal. *See Pls.' Exs. 5, 6, and 7.*

44. § 727(a)(5).

45. *Stewart, supra,* 263 B.R. at 618; *cf. Serafini, supra,* 938 F.2d at 1157.

46. *Stewart, supra,* 263 B.R. at 618 (citation omitted).

47. *Stathopoulos v. Bostrom (In re Bostrom),* 286 B.R. 352, 364–65 (Bankr.N.D.Ill.2002) (citations omitted).

48. *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir.1984) (and cases cited therein); *see also Matter of D'Agnese,* 86 F.3d 732, 734 (7th Cir.1996) (discharge denied under § 727(a)(5) where debtor claimed, without supporting documentation, to have sold over $300,000.00 in assets pre-petition); *Solomon v. Barman (In re Barman),* 244 B.R. 896, 901 (Bankr.E.D.Mich.2000) (discharge denied under § 727(a)(5) where debtor claimed, without supporting documentation, to have sustained $131,000.00 in gambling losses); *Mitchell v. Blasini (In re Blasini),* 67 B.R. 373, 375 (D.P.R.1986) (discharge denied as a result of failure to explain loss of $500,000.00 in business assets).

The Court does not expect debtors to be able to trace virtually every penny which they spent during the years prior to filing of bankruptcy. However, debtors cannot expect to respond to questions regarding their financial activities with a cursory "I don't know" or "I did not keep records" and expect to obtain a discharge.[49]

Nothing in this case causes the Court to depart from this position.

 In closing argument, the Cranes have identified the following assets, the loss of which they contend has not been satisfactorily explained:

1. Cattle;

2. Inventory;

3. Life insurance; and

4. Business contracts.[50]

Plaintiffs allege that these assets were identified on financial statements supplied to Grand Federal but are not listed on the schedules and statement of affairs filed in this case. Plaintiffs thus contend that the assets did exist at one time, and that their disappearance has not been explained. The contention is not supported by the record.

With respect to the issue of the cattle, it is true that Morris submitted a financial statement to Grand Federal which included cattle as an asset. The only evidence adduced at trial on this issue was to the effect that Morris *never* owned an interest in cattle, and that the cattle were listed on the financial statement in error. In effect, Morris has explained the "loss" of this asset by establishing that he never owned the asset. It is obvious that Plaintiffs and their counsel do not accept this explanation. However, they have offered nothing

to contradict it. Under § 727(a)(5), the burden falls upon the Plaintiffs to establish the initial existence of the asset and its subsequent disappearance. With respect to the cattle, they have done neither.

The argument regarding life insurance is even more tenuous. In two of three financial statements submitted to Grand Federal, Morris listed life insurance with a cash value of *zero,* and a death benefit of $250,000.00.[51] Morris testified that the life insurance was term insurance which never had any cash value, and that the insurance lapsed due to non-payment of premiums prior to the filing of the bankruptcy case. Indeed, if the financial statements are accurate, the insurance lapsed prior to March 13, 2001. In any event, the cash value of this "asset" never rose above zero. When it comes to the life insurance, there is no loss of assets to be explained.

The Cranes next take issue with the disposition of proceeds of $17,000.00 from the Self contract. Morris testified that the initial $7,000.00 payment from the Selfs was spent on their construction project. Although he presented no records to support his testimony, the Cranes had no evidence to dispute his statements. The most telling evidence in support of Morris' position is the fact that the Self contract was completed without incident and without the recording of liens against the Self property. The $10,000.00 payment was deposited into the GLBI account; its expenditure can be traced therefrom. The Court finds the explanation of the Debtor as to the disposition of these monies to be satisfactory.

The final issue raised by the Cranes has to do with the inventory figure of $128,200.00 contained in Morris' federal

---

**49.** *American Bank & Trust Co. v. Elkins (In re Elkins),* Adv. Proc. No. 98–0063–M, slip op. at 6 (Bankr.N.D.Okla. Feb. 11, 1999).

**50.** *Plaintiffs' Closing Argument at 11–12.*

**51.** *See Pls.' Exs. 6 and 7.*

income tax return for year 2000. The Cranes contend that they have no idea what happened to the property represented by this number. In response, Morris states that the numbers represent: (1) the value of the Spec House; and (2) the value of the house constructed for Rogers, which was in a stage of partial completion as of December 31, 2000. With respect to the Spec House, the same was included in Morris' bankruptcy schedules. With respect to the Rogers house, the same was completed prior to the filing of the case. Upon its completion, Morris had no interest in the Rogers house, and could not consider it part of his business inventory. The explanation given by Morris is logical and plausible, and is supported by the documents which he has submitted relating to construction of the Rogers house. There is no unexplained loss of assets with respect to the inventory listed on Morris' 2000 federal income tax return.

### Motion for Sanctions

■ In addition to the merits of the case, the Court has remaining before it a request for sanctions brought by counsel for the Cranes against counsel for Morris. The Court held a hearing on said request on March 25, 2003, and issued a bench ruling on March 31, 2003, wherein the Court made certain rulings regarding discovery responses, and deferred all issues regarding the imposition of sanctions until the time of trial. After review of the various motions and responses filed by the parties, and after a review of the procedural history of this case, including but not limited to a revisiting of all hearings relat-

ing to discovery disputes, the Court declines to award sanctions.

■ Under the applicable rule,

If the motion [to compel discovery] is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.[52]

Courts have consistently held that the trial court has discretion over the imposition of discovery sanctions.[53] Likewise, courts have broad discretion when addressing the reasonableness of a party's good faith attempts to confer and obtain discovery without court action.[54]

In the present case, the parties' efforts at discovery were mixed between informal agreements and formal motions. As the Court informed the parties, it did not have the ability to enforce their informal agreements; its power is limited to the resolution of disputes based upon formal discovery. On at least one occa-

---

52. FED. R. CIV. P. 37(a)(4)(A). This rule is made applicable to this adversary proceeding by FED. R. BANKR P. 7037.

53. See United States v. Golyansky, 291 F.3d 1245, 1249 (10th Cir.2002) (district courts have broad discretion to sanction a party violating an order); Orjias v. Stevenson, 31 F.3d 995, 1005 (10th Cir.1994) ("[i]mposition of

sanctions ... is a matter within the discretion of trial court.").

54. See Cotracom Commodity Trading Co. v. Seaboard Corp., 193 F.R.D. 696, 699 (D.Kan. 2000); Pulsecard, Inc. v. Discover Card Services, Inc., 168 F.R.D. 295, 302 (D.Kan.1996).

sion, the Plaintiffs moved to compel discovery on the basis that the answers given were incomplete. In response, counsel for Morris indicated that he had produced all information and/or documentation responsive to the request. At the time of trial, Plaintiffs gave no indication that they had been prejudiced by a lack of discovery; similarly, none of the evidence offered by Morris was objected to on the basis of surprise. The parties and their counsel in this case had difficulty agreeing on anything of consequence, as evidenced by the fact that the Court was required to take the extraordinary step of sequestering counsel in order to obtain any semblance of a pretrial order. Under this scenario, the Court is loath to shift any of the fees incurred by either party. The Court therefore, acting within its discretion, declines to enter any award of sanctions.

### Conclusion

Denial of a discharge is one of the harshest rulings which this Court can enter. To put it simply, if there is no discharge, there is no fresh start. It is for that reason that bankruptcy courts are given some degree of discretion and latitude in these matters. After a review of the evidence presented, this Court is convinced that Morris has not made any false oaths to this Court. It is equally convinced that there has been no failure of record keeping which would justify the denial of a discharge. The Court also finds that Morris has satisfactorily explained any loss in assets which occurred prior to the filing of the bankruptcy case. He is entitled to his discharge.

The Complaint filed by the Cranes herein is dismissed with prejudice. The Request for Sanctions filed by the Cranes is denied. Each party shall bear their own fees and costs.

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

### JUDGMENT

This matter came on for trial on October 28, 2003. The issues having been duly considered and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS HEREBY ORDERED that the Complaint filed by Plaintiffs H.L. Crane and Elaine Crane be, and the same hereby is, dismissed with prejudice.

IT IS FURTHER ORDERED that the Clerk of this Court may enter an order of discharge in Case No. 01–03119–M, David Keith Morris, Debtor.

IT IS FURTHER ORDERED that each party shall bear its own fees and costs incurred in this adversary proceeding, and that no sanctions or fees shall be awarded to any of the parties or their counsel.