In re Sarah M. PHOUMINH, Debtor.

Charles F. McVay, United States Trustee, Plaintiff,

v.

Sarah M. Phouminh, Defendant.

Bankruptcy No. 03–26899 HRT. Adversary No. 04–1050 HRT.

United States Bankruptcy Court, D. Colorado.

July 25, 2005.

John Cimino, Denver, CO, Keith Moskowitz, Boulder, CO, for debtor.

Leigh Lichtenegger, Paul G. Quinn, Denver, CO, for U.S. Trustee.

## ORDER ON AMENDED COMPLAINT TO DENY DISCHARGE

HOWARD R. TALLMAN, Bankruptcy Judge.

This case comes before the Court on the United States Trustee's ["UST's"] Amended Complaint to Deny Discharge [the "Amended Complaint"].

The case came on for trial on May 13, 2005. Leigh Lichtenegger and Paul Quinn appeared for the United States Trustee and H. Christopher Clark appeared for the Defendant. After the presentation of evidence, the parties were requested to submit their closing arguments to the Court in writing with the UST's final response to be due no later than June 15, 2005. Upon submission of the UST's final response, the matter was taken under advisement. After having considered the evidence presented at trial along with the pleadings and written arguments submitted by the parties, the Court is ready to rule.

## I. JURISDICTION

This matter is brought under 11 U.S.C. § 727(a). This is a civil proceeding arising under title 11 over which the district court exercises original jurisdiction under 28 U.S.C. § 1334(b). The matter is referred to this Court under 28 U.S.C. § 157(a). It is a core proceeding which this Court may hear and determine under 28 U.S.C. §§ 157(b)(1) & (b)(2)(J). The following constitutes this Court's findings of fact, conclusions of law and final order.

## II. FACTS

The following facts were stipulated to by the parties in their Joint Pretrial Statement filed with the Court on April 28, 2005.

1. The Defendant, Sarah M. Phouminh, filed her Chapter 7 Voluntary Petition, Schedules and Statement of Financial Affairs ["SOFA"] on August 26, 2003.

2. The Original Petition, Schedules, and SOFA were signed and dated under the penalty of perjury on August 25, 2003.

3. Mr. Glen R. Anstine, the Chapter 7 trustee, conducted the Meeting of Creditors required by 11 U.S.C. § 341 on October 2, 2003.

4. On November 24, 2003, the Enger Family Partnership, through counsel Martin E. Long, took a FED. R. BANKR. P.2004 examination of the Defendant ("Rule 2004 Examination").

5. On December 1, 2003, the Defendant filed her First Amended Petition

and her First Amended SOFA. The First Amended Petition was signed under the penalty of perjury on November 25, 2003. The First Amended SOFA was not signed by the Defendant, but the Defendant did initial every page of the First Amended SOFA.

6. The First Amended Petition contained the following amendments in the "All Other Names used by the Debtor in the last 6 years" box:

   a. "Fdba Super Asian Market" was amended to "Member & Manager Super Asian Market LLC"

   b. "As a Member And Manager Of S & M LLC" was amended to "Member & Manager Of S & M LLC"

7. The First Amended SOFA contained the following amendments:

   a. The First Amended SOFA, Q. 4., was corrected to disclose the Enger Family Partnership, LLLP, lawsuit.

   b. The First Amended SOFA, Q. 3.a., was amended to include the following sentence: "The supplement to Statement of Financial Affairs, Question 3 which was included in the original filing relates to payments made by Super Asian Market LLC."

   c. The First Amended SOFA, Q. 19.-a., was amended to include Hull & Associates as the Defendant's accountant.

   d. The First Amended SOFA, Q. 19.-d., was amended to include Jerry Enger as a creditor to whom a financial statement was issued within the two years immediately preceding the commencement of the bankruptcy case.

8. On January 30, 2004, the UST filed his Complaint to Deny Discharge against the Defendant ["Original Complaint"], Adversary No. 04–1050–HRT.

9. On March 17, 2004, John A. Cimino filed a motion to substitute counsel requesting that he be allowed to substitute as counsel in place of Keith Moskowitz. This motion was granted on March 18, 2004.

10. On March 17, 2004, the UST, through counsel, and the Defendant, through counsel, agreed to hold matters in abeyance for sixty days in which to exchange information.

11. On March 29, 2004, the UST sent the Defendant's counsel a letter requesting that certain documents be produced. On May 21, 2004, the Defendant partially responded to the UST's March 29, 2004, informal request for documents.

12. On July 2, 2004, the Defendant filed her Answer to the UST's Original Complaint. The only affirmative defense asserted in the Defendant's Answer was that the complaint fails to state a claim for which relief can be granted.

13. On September 17, 2004, the UST mailed the Defendant the UST's Interrogatories, Requests for Production of Documents and Requests for Admissions.

14. On September 20, 2004, the UST filed his Amended Complaint to Deny Discharge against the Defendant ["Amended Complaint"]. The Amended Complaint did not add any new causes of actions or new parties, but did add additional factual statements to support the causes of actions stated in the Original Complaint.

15. On October 19, 2004, the Defendant filed her Second Amended Petition. The Second Amended Petition was signed under the penalty of perjury on October 19, 2004.

16. The Second Amended Petition made the following changes:

   a. The Second Amended Petition corrected the "Name of Debtor" box by replacing Sarah M. Phouminh with Sarah Manithong Phouminh.

   b. The Second Amended Petition corrected the "All Other Names used by the Debtor in the last 6 years" box by including the following names: fdba Translation And Marketing; fdba Translation And Consultation; fods Denver Therapy, Inc.; fmem S & M, LLC; fmem Super Asian Market, LLC; and fdba First Class Travel.

   c. The Second Amended Petition corrected the "Street Address of Debtor" to list the Defendant's current address of 2185 Pinon Cir., Erie, CO 80516–7958.

   d. The Second Amended Petition corrected the "Location of Principal Assets of Business Debtor" to list 8868 Federal Blvd. # 12, Denver, CO 80260–5852.

   e. The Second Amended Petition changed the Estimated Assets from $500,000—$1 million to $0 to $50,000.

   f. The Second Amended Petition changed the Estimated Debts from $500,000—$1 million to $0 to $50,000.

17. On November 12, 2004, the UST was provided with the Defendant's Answers to the UST's Interrogatories, Requests for Production of Documents and Requests for Admissions.

18. November 13, 2004, the Defendant filed her Answer to the UST's Amended Complaint. The Defendant's Answer to the Amended Complaint asserted four affirmative defenses including attorney malpractice of Keith Moskowitz, disorganized records, lack of knowledge, intent or fraud, and that a full explanation had been provided on November 12, 2004.

19. On November 22, 2004, the UST, through counsel, took the deposition of the Defendant.

20. On November 23, 2004, the Defendant filed her Third Amended Petition and her Second Amended SOFA. The Third Amended Petition and Second Amended SOFA were signed under the penalty of perjury on November 22, 2004.

21. The Third Amended Petition made the following changes:

   a. The Third Amended Petition corrected the "All Other Names used by the Debtor in the last 6 years" box by replacing "fmem S & M, LLC" with "fmem S & N, LLC."

   b. The Third Amended Petition corrected the "Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No." to include the number 41–3049941.

   c. The Third Amended Petition removed the address listed in the "Location of Principal Assets of Business Debtor" box.

   d. The Third Amended Petition changed the Estimated Assets to $100,000 to $500,000.

   e. The Third Amended Petition changed the Estimated Debts to $100,000 to $500,000.

22. The Second Amended SOFA contains the following changes:

   a. SOFA, Q. 1., changed the Defendant's income for the years 2001, 2002, and 2003.

   b. SOFA, Q. 4.a., was changed to include the Trilogy Builders, Inc. lawsuit.

   c. SOFA, Q. 8., was changed to include gambling losses of $30,000 instead of the $6,000 on the original SOFA.

   d. SOFA, Q. 8., was changed to include the loss of her Asian Super Market business.

   e. SOFA, Q. 9., was changed to include the sentence, "Debtor also paid the filing fee of $200.00."

   f. SOFA, Q. 10., was changed to include the sentence, "Debtor also borrowed $10,000 from this individual and gave her a lien against the debtor's 2001 Nissan Quest GXE in July, 2003. These sale and this loan were separate transactions."

   g. SOFA, Q. 11., was changed to provide more details on the two accounts previously listed.

   h. SOFA, Q. 15., was changed to include the Defendant's address of the petition date as a "Prior address of debtor."

   i. SOFA, Q, 18., was changed to add Denver Therapy, Inc.; First Class Travel; Translation & Marketing; S & N, LLC; and Translation And Consultation.

   j. SOFA, Q. 20., was changed to include the inventory of the Defendant's Super Asian Market.

23. During the time period of October, 2000, through July, 2003, the Defendant was an employee of North Irving Chiropractic and served as an office manager. During this same time period, the Defendant also worked as a sole proprietor doing "translation and consulting" and "translation and marketing" whereby she translated for a variety of chiropractic businesses, doctors and lawyers. The Defendant's sole proprietorships were not disclosed on the original SOFA, Q. 18., nor the Amended SOFA, Q. 18., but were disclosed on the Second Amended SOFA, Q. 18.

24. For the tax years 2001, 2002 and 2003, the Defendant filed a Schedule C (Form 1040) Profit or Loss from Business for both the "Translation and Consultation" business and the "Translation and Marketing Business." The name of the proprietor for each of these businesses is Sarah M. Phouminh, the Defendant.

25. The Defendant's Original SOFA, Q. 1., and Amended SOFA, Q. 1., failed to disclose the source of the Defendant's income, but disclosed the income for the years 2001, 2002 and 2003 YTD as follows:

Year 2001 = $228,690

Year 2002 = $97,000

Year 2003 YTD = $48,000

26. The Defendant's Second Amended SOFA, Q. 1., discloses income for the years 2001, 2002, and 2003 YTD as follows:

| | |
|---|---|
| Year 2001 = $280,877.50 | Various sources including wages, gambling winnings, retirement distributions, and self employment income. |
| Year 2002 = $153,482.00 | Various sources including wages, gambling winnings, and self employment income. |
| Year 2003 = -$141,345.00 | Various sources including wages, gambling winnings, retirement distributions, and self employment income. |

There is a notation under the Year 2003 figure stating, "Figure shown is from adjusted gross income (in this case a loss) on federal income tax return."

27. The Defendant's Original SOFA, Q. 2., Amended SOFA, Q. 2., and Second Amended SOFA, Q. 2., do not disclose any other income.

28. The Defendant's tax forms W–2 and 1099, produced by the Defendant on November 12, 2004, reveal that the Defendant had gross income for the year 2001 of an amount not less than $327,427.92 as follows:

North Irving Chiropractic, LLC: $45,400 (form W–2)

AT & T Bis Payroll, Inc.: $484.89 (form W–2)

Cherry Creek Chiropractic Center, P.C.: $3200 (form W–2)

Laurence S. Aylesworth: $4,122.34 (form 1099)

Philip R. Cockerille, P.C.: $19,558 (form 1099)

Massage Good, Inc.: $1196 (form 1099)

New Start Chiropractic Center: $18,296 (form 1099)

Wellness Center of North Inving: $34,100 (form 1099)

North Irving Rehabilitation, LLC: $47,769 (form 1099)

Natural Health Consultants, PC: $4,083 (form 1099)

North Irving Chiropractic: $145,302.68 (form 1099)

Sentry 401k Plan: $97.17 (form 1099)

Fidelity Investments: $3,828.84 (form 1099)

2001 Total W–2 & 1099: $327,437.92

29. The Defendant's tax forms W–2 and 1099, produced by the Defendant on November 12, 2004, reveal that the Defendant had gross income for the year 2002 of an amount not less than $304,888.50 as follows:

North Irving Chiropractic, LLC: $67,600 (W–2)

North Irving Chiropractic: $10,808.93 (1099)

Malman Dehncke, PC: $2,100 (1099)

Philip P. Cockerille, P.C.: $24,001 (1099)

Wellness Center of North Irving, LLC: $83,800 (1099)

North Irving Rehabilitation, LLC: $88,436 (1099)

Asian Psychological Services: $23,708.57 (1099)

Isle of Capri: $2,785 (W–2G)

Isle of Capri: $1,649 (W–2G)

2002 Total W–2 and 1099 = $304,888.50

30. The Defendant's tax forms W–2 and 1099, produced by the Defendant on November 12, 2004, reveal that the Defendant had gross income for the year 2003 of an amount not less than $65,963.78 as follows:

North Irving Chiropractic, LLC: $39,538 (W–2)

North Irving Chiropractic, LLC: $9,141 (1099)

Wellness Center of North Irving, LLC: $8,098.78 (1099)

Colorado Department of Labor and Employment: $7,562 (1099–G)

Isle of Capri: $1,624 (W–2G)

2003 Total W–2 and 1099 = $65,963.78

31. The form W–2 and 1099 year 2003 income in the total amount of $56,777.78 from North Irving Chiropractic, LLC, and Wellness Center of North Irving, LLC, was

earned prior to the petition date of August 26, 2003.

32. The Defendant, in response to Schedule B, Q. 2., discloses a checking account at 1st Bank of Arvada with a value of $50.00.

33. The Defendant, in response to SOFA, Q. 11., discloses a closed checking account at 1st Bank of Arvada with a zero balance.

34. The documents provided by the Defendant disclosed that the Defendant had the following bank accounts that should have been disclosed on either Schedule B or SOFA, Q. 11.:

    a. 1st Bank of Arvada, account number xxx–xxx–1591 in the name of Sarah Phouminh with a balance on the petition date of $228.30.

    b. 1st Bank of Wheat Ridge, account number xxx–xxx–0853 in the name of Sarah and Nhoui Phouminh with a zero balance on the petition date.

    c. 1st Bank of Arvada, account number xxx–xxx–1448 in the name of Sarah and Nhoui Phouminh with a negative balance on the petition date.

35. The Defendant made the following payments out of the 1st Bank of Arvada accounts (xxx–xxx–2230 and xxx–xxx–1448) aggregating more than $600 within the ninety (90) days preceding her bankruptcy in the total amount of $67,121, which were not disclosed in response to SOFA, Q. 3.a.:

| Date | Amount | Check No. | Payee |
| --- | --- | --- | --- |
| Account xxx–xxx–2230: | | | |
| 06/02/03 | $1,400 | 8133 | D. C. Sign |
| 06/02/03 | $2,336 | 8155 | J. C. Trading |
| 06/10/03 | $634 | 8134 | Tebo |
| 06/11/03 | $1,256 | 8150 | Stathopolus & Assoc. |
| 06/12/03 | $925 | 8148 | Southern California Produce |
| 06/12/03 | $674 | 8145 | Seafood R Us, Inc. |
| 06/12/03 | $1,902 | 8156 | J. C. Trading |
| 06/12/03 | $609 | 8144 | Southern California Produce |
| 06/13/03 | $1,000 | 8180 | Cash |
| 06/13/03 | $661 | electronic | Visa Last Minute Getaways |
| 06/13/03 | $775 | 8181 | Cash |
| 06/13/03 | $15,595 | 8089 | U.S. Trading |
| 06/27/03 | $9,598 | 8194 | Unknown |
| 06/30/03 | $675 | electronic | Qwest |
| 06/30/03 | $1,190 | electronic | Unknown |
| 07/01/03 | $6,156 | 8186 | Anhimg Cos |
| 07/02/03 | $700 | electronic | Unknown |
| 06/06/03 | $2,000 | 8248 | Enger Enterprises |
| 06/06/03 | $7,200 | 8247 | Enger Enterprises |
| 07/14/03 | $2,838 | 8258 | Seafood R Us, Inc. |
| 07/21/03 | $1,325 | 8215 | Unknown |
| 07/25/03 | $1,500 | 8261 | Southern California Produce |
| 08/05/03 | $750 | 8283 | Gung Gia Vuong |
| Account xxx–xxx–1448: | | | |
| 06/11/03 | $667 | 2166 | Clock Tower |

| | | | |
|---|---|---|---|
| 06/11/03 | $667 | 2165 | Clock Tower |
| 07/04/03 | $670 | 2196 | Siphai Onemanyvong |
| 07/07/03 | $1,500 | 2190 | Isle of Capri |
| 08/11/03 | $918 | 2213 | Liberty Mutual |
| 08/22/03 | $1,000 | 2224 | Isle of Capri |

36. The Defendant made the following payments out of the 1st Bank of Arvada account (xxxxxx–1448) to insiders within one year preceding her bankruptcy in the total amount of $7,420, which were not disclosed in response to SOFA, Q. 3.b.:

| Date | Amount | Check No. | Payee |
|---|---|---|---|
| 10/24/02 | $2,300 | 2454 | Nhoui Phouminh |
| 11/15/02 | $800 | 2468 | Nhoui Phouminh |
| 11/25/02 | $600 | 2483 | Nhoui Phouminh |
| 01/08/03 | $700 | 2519 | Nhoui Phouminh |
| 03/25/03 | $700 | 2579 | Nhoui Phouminh |
| 03/26/03 | $100 | 2586 | Linda Phouminh |
| 03/26/03 | $700 | 2582 | Nhoui Phouminh |
| 04/24/03 | $200 | 2600 | Linda Phouminh |

37. The UST's Amended Complaint, at paragraphs 85 through 88, alleges that the Defendant failed to disclose other names used by the Debtor in the last six years. The UST now understands that one of those names was the Defendant's maiden name, and now middle name, Manithong. The UST withdraws these allegations as part of the basis for denial of discharge under 11 U.S.C. § 727(a)(4)(A).

The presentation of evidence at trial did not go significantly beyond the facts stipulated to by the parties in advance.

## III. DISCUSSION

The Amended Complaint states three causes of action under 11 U.S.C. § 727(a). It charges that the Debtor's discharge should be denied: under § 727(a)(3) because the Debtor concealed or failed to keep or preserve recorded information; under § 727(a)(4)(A) because the Debtor made material false oaths and accounts in connection with her bankruptcy case; and under § 727(a)(5) because the Debtor has failed to satisfactorily explain losses of assets and the deficiency of assets to meet her liabilities.

### A. Denial of Discharge Under § 727(a)(3)

■ The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge. The statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history. *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3rd Cir.1992). That section provides that:

The court shall grant the debtor a discharge, unless ... the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

■ The Tenth Circuit has observed that "[i]n order to state a prima facie case, [plaintiff] had to demonstrate that [defendant] had failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material business* transactions." *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997) (citing *In re Folger*, 149 B.R. 183, 188 (D.Kan.1992)); *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 615 (10th Cir. BAP 2001). It is up to the Trustee to establish a prima facie case for denial of discharge under § 727(a)(3). Only if the Trustee accomplishes that initial task does the burden shift to the Debtor to come forward with an explanation for the lack of recorded information. *PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 117 n. 17 (Bankr.W.D.Pa.2000); *Beneficial Mortgage Co. v. Craig (In re Craig)*, 140 B.R. 454, 458 (Bankr.N.D.Ohio 1992).

■ "The long-standing rule in the Tenth Circuit is that: 'Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them.' " *In re Stewart*, 263 B.R. at 615 (citing *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir.1939)).

The quantum of evidence submitted by the UST at trial, in large measure, undercuts his allegation of a failure to maintain records. The majority of the 42 exhibits admitted into evidence consists of bank records, tax returns, W–2 and 1099 forms and various lease agreements produced by the Debtor. It is apparent that Debtor was able to produce substantial recorded information.

■ Furthermore, the focus of § 727(a)(3) is on the chapter 7 trustee and the creditors having access to recorded information that allows the trustee to administer the case and the creditors to protect their rights in the bankruptcy case. Glen Anstine, the chapter 7 trustee, testified that the Debtor was cooperative and forthcoming with information that he had requested. The trustee testified to no difficulties which he experienced due to the Debtor's failure to maintain recorded information. Nor was there testimony from creditors to the effect that they were hindered in their efforts during the bankruptcy case due to a lack of records.

In the UST's closing statement, he complains of Debtor's tardiness in responding to document requests. But tardiness in producing documents and information does not amount to a failure to keep the recorded information. Nor do such complaints contained in a closing argument rise to the level of evidence necessary for the UST to carry his burden of proof.

The Court will deny UST's request to deny the Debtor her discharge under § 727(a)(3).

*B.  Denial  of  Discharge  Under § 727(a)(4)(A)*

The Supreme Court has described the principle of "affording relief only to an 'honest but unfortunate debtor' " as "a basic policy animating the [Bankruptcy] Code." *Cohen v. de la Cruz*, 523 U.S. 213,

217, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998) (quoting *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)). That policy is reflected in § 727(a)(4)(A) which denies the privilege of a bankruptcy discharge to a debtor who commits fraud with respect to the information provided to the court, creditors and trustee on the debtor's bankruptcy schedules or through other documents or testimony provided by the debtor in a bankruptcy case. That section provides that

The court shall grant the debtor a discharge, unless ... the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account.

11 U.S.C. § 727(a)(4)(A).

■ At the same time, Congress set the bar for denial of discharge under this section very high by specifying that the debtor must have made a false oath or account "knowingly and fraudulently." It is not enough for the Trustee to point to inaccuracies and inconsistencies in the Debtor's schedules, as troubling as those might be. To deny the Debtor a discharge under § 727(a)(4)(A), the Court must be able to find that the Debtor intended to defraud and mislead the other parties in the case.

It is well-established that to prove an objection to discharge under § 727(a)(4)(A), the creditor must prove the following by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y.2000); *see, also, Sholdra v. Chilmark Financial, LLP (In re Sholdra)*, 249 F.3d 380, 382

(5th Cir.2001); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir.2000); *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir.1987); *Clean Cut Tree Service, Inc. v. Costello (In re Costello)*, 299 B.R. 882, 899 (Bankr.N.D.Ill. 2003); *Woolman v. Wallace (In re Wallace)*, 289 B.R. 428, 433 (Bankr.N.D.Okla. 2003); *Overly v. Guthrie (In re Guthrie)*, 265 B.R. 253, 262 (Bankr.M.D.Ala.2001); *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 574 (Bankr.N.D.Ill.2000).

■ The burden of proof in a case seeking denial of discharge is always upon the party objecting to the debtor's discharge. FED. R. BANKR. P. 4005. Once the plaintiff has met its burden of presenting prima facie evidence going to each of the elements of its case, thereby raising a reasonable inference of the debtor's intentional fraud, the burden shifts to the debtor to provide a cogent explanation for the omissions or misstatements. *American Nat. Bank of Denver v. Rainguet*, 323 F.2d 881, 882 (10th Cir.1963); *Johnson v. Bockman*, 282 F.2d 544, 545 (10th Cir.1960); *Jones v. Gertz*, 121 F.2d 782, 783 (10th Cir.1941); *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 614–15 (10th Cir. BAP 2001) (burden shift under § 727(a)(3)); *Crane v. Morris (In re Morris)*, 302 B.R. 728, 742 (Bankr.N.D.Okla. 2003).

■ In the vast majority of cases, fraudulent intent must be inferred from the facts and circumstances of the case. *Job v. Calder (In re Calder)*, 907 F.2d 953, 955–56 (10th Cir.1990); *Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982). Under some circumstances, a reckless indifference to the truth, may lead to an inference of fraud for purposes of § 727(a)(4)(A). *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir.1987); *Diorio v. Kreisler–Borg Const. Co.*, 407 F.2d 1330, 1331 (2nd Cir.

1969); *Cadle Co. v. King (In re King)*, 272 B.R. 281, 302 (Bankr.N.D.Okla.2002); *Camacho v. Martin (In re Martin)*, 88 B.R. 319, 324 (D.Colo.1988).

For the purposes of § 727(a)(4)(A), "[t]he subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984); *see, also, Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992); *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir.1990).

There is no question that information provided on Debtor's schedules, under oath, was inaccurate. The Court also finds that it was "material" because it concerns, among other things, the Debtor's business dealings and the Debtor's cash assets. The question is whether the facts of the case demonstrate that the Debtor knew the information to be false and that she provided that false information with a fraudulent intent. While the Court acknowledges that the question is a close one, the evidence persuades the court that the Debtor did not possess a fraudulent intent.

The UST points to inaccurate income reporting on Question 1 and Question 2 of Debtor's SOFA. There is a discrepancy between the income reported on the Debtor's SOFA and her gross income as disclosed on her W–2 and 1099 forms and her income tax returns. Mr. Anstine, the chapter 7 trustee for Ms. Phouminh's case testified that he had requested tax returns, bank statements and business records at the § 341 meeting or creditors. His testimony was that Ms. Phouminh readily cooperated with him by providing him with a bankers box containing the requested records. The volume of the material provided by Ms. Phouminh was such that Mr. Anstine's review of those records took him approximately five to six hours. During the course of administering the estate Mr. Anstine received Ms. Phouminh's 2001, 2002 and 2003 income tax returns. Those returns covered the full period of time covered by the income questions on the Debtor's SOFA. While it is clear that the Debtor was careless in her answers to the income questions, it is equally clear that when the chapter 7 trustee requested tax returns, the Debtor turned them over. Thus, with regard to her income reporting, the totality of the Debtor's behavior evidences neither an intent to mislead nor a degree of recklessness that could justify a finding that those false statements were both knowing and fraudulent.

The UST also cites Ms. Phouminh's failure to list all business interests on her SOFA as evidence of fraud under § 727(a)(4)(A). Ms. Phouminh's original bankruptcy counsel testified that it is his practice to provide a bankruptcy questionnaire to his bankruptcy clients and to have them fill out the questionnaire and return it to him. He then sits down with the client to go over the answers.

The Court will initially note that the question that appears on the questionnaire used by Debtor's counsel, relating to Question 18 on the SOFA, appears as follows:

16a  List the name and address of your business:
Name
Address
16b  What kind of business are you engaged in?
16c  When did you begin your business?
16d  If you are no longer in business, when did you end your business?

By contrast, Question 18 of the SOFA appears as follows:

18. **Nature, location** and **name** of **business**
None    a.    If the debtor is an individual, list the names, addresses, taxpayer

☐ identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within the six years immediately preceding the commencement of this case.

If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

| NAME | TAXPAYER I.D. NO.(EIN) | ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|------|------------------------|---------|--------------------|-----------------------------|
|      |                        |         |                    |                             |

b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

| NAME | ADDRESS |
|------|---------|
|      |         |

The Court cannot help but observe that a fair amount gets lost in the translation from the actual version to the questionnaire version. The time period referenced in the question does not appear in the questionnaire version nor does the extensive listing of possible capacities a debtor may hold in a business. No information appears on the Debtor's completed questionnaire in response to that question regarding business information. Debtor's counsel testified that he does not rely solely on a debtor's responses to questionnaire items because, in his experience, many items are left blank. It is his habit to conduct follow-up interviews with his clients to fill in any missing or unclear information.

Debtor's counsel was well aware of the Debtor's involvement in the Super Asian Market as well as a legal dispute with the Enger Family Partnership LLLP, because that legal dispute involving the rented space for the market was the reason for Debtor's initial contact with him. Super Asian Market is reflected as an fdba in the Other Names box of the Voluntary Petition filed on August 26, 2003. An additional business, S & N LLC,[1] is also listed in that box. Information regarding Super Asian Market shows up on Question 18 of the SOFA, which was filed with the original Voluntary Petition, but no information on S & N LLC is reflected there.

The Debtor was, in fact, involved in other businesses at various times. Debtor's Second Amended Petition, filed on October 19, 2004, by Debtor's replacement counsel, reflected additional Other Names

---

1. This is actually listed as S & M LLC on the Voluntary Petition and various other documents. However, that appears to be a typographical error and the correct business name was S & N LLC.

of "fdba Translation and Marketing;" "fdba Translation and Consultation;" "fods Denver Therapy, Inc.;" and "fdba First Class Travel." Debtor was not involved in any of these businesses on the Petition Date. Translation and Marketing and Translation and Consultation both operated until 2003 prior to the Petition Date. The other business entities ceased operations some years prior to 2003. Disclosure of those prior business entities did not lead to discovery of any concealed assets or voidable transfers.

Absent some advantage to be gained from the non-disclosure of the prior business entities, the Court is hard pressed to infer that the non-disclosure was motivated by a fraudulent intent on the Debtor's part. Nor does the Court find that the Debtor's non-disclosure rises to the level of recklessness that would be the functional equivalent of a knowing and fraudulent act. In *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290 (10th Cir.1997), the Tenth Circuit reversed the district court's affirmance of a bankruptcy court denial of discharge under § 727(a)(4)(A). The bankruptcy court's holding was based upon the debtor's recklessness in failing to disclose the transfer of four automobiles between one and two years before the bankruptcy filing and the omission of an automobile from the debtor's schedules. The bankruptcy court had found a pattern of non-disclosure and failure to amend schedules that it believed justified the denial of discharge to the debtor. But the Tenth Circuit found that bankruptcy court determination to be in error. The Tenth Circuit did not disturb the bankruptcy court's factual finding that the debtor had failed to disclose the sale of four automo-

biles. It did find that there was "no evidence that the transactions were not disclosed for fraudulent reasons." *Id.* at 1295. Similarly, in this case, the Debtor was, at most, careless in failing to disclose all of her prior business interests. However, those particular non-disclosures were without consequence and cannot support a finding of fraudulent intent.

The Debtor's SOFA does not reflect the lawsuit that she was involved in with the Enger Family Partnership, LLP. Debtor's original counsel testified that he was fully aware of the lawsuit prior to filing the petition but that he failed to list it in Question 4 of the SOFA. However, the claim asserted by the Enger Family Partnership, LLLP, is reflected in the Debtor's schedule of liabilities. The fact that an item could have been scheduled in two places but is only reflected in one hardly strikes the Court as a fraudulent omission. Moreover, the Court does not charge a debtor with the responsibility to be intimately familiar with how items are to be scheduled in the bankruptcy papers. That is what a debtor pays an attorney for. Where Debtor's counsel comes forward and testifies that he was fully informed of the lawsuit and failed to schedule it properly, it would be unjust to penalize the Debtor for that failure. All the more so in this case where the claim asserted in the lawsuit does appear as a liability in the Debtor's schedules.

The Debtor's original schedules do not reflect the correct amount of gambling losses. The original schedules reflected $6,000.00 of gambling losses. That figure was later amended to $30,000.00 of gambling losses.[2] The originally reported magnitude of Debtor's gambling losses ap-

---

2. The Court will note that, whereas the fivefold difference between $6,000.00 and $30,000.00 is extreme, gambling losses are necessarily an item that calls for estimation.

Unlike certain gambling winnings, casinos are not required to track and report a customer's losses.

pears to have been wildly inaccurate. Nonetheless, the fact that the Debtor did incur substantial gambling losses is disclosed on the original schedules. Again, the absence of any advantage to the Debtor represented by her underreporting of gambling losses makes it impossible for the Court to find fraudulent intent in the inaccurate scheduling of that item.

The UST points to non-disclosure of bank accounts as evidence of a false oath justifying the denial of discharge. The UST argues that the account belonging to Super Asian Market, LLC, was a personal account that required full disclosure because Debtor intermingled personal funds with business income; Debtor was the sole member of the LLC; she listed liabilities of Super Asian Market on her Schedule F; and paid for the market's lease out of that account even though she was personally liable on the lease. The intermingling that UST refers to was money from a second mortgage on Debtor's property deposited into the market account; proceeds from a personal loan taken from Shawn Pong deposited into the market account; and Debtor's IRA distribution deposited into the market account. But the Debtor's deposits of loan proceeds and IRA funds into the business is evidence of the Debtor trying to prop up her failing business. The listing of such business debts on Schedule F is simply good practice because it is frequently difficult to determine with certainty which debts may be subject to personal guarantees. Payment of the lease for premises out of which the market operated was certainly a business expense regardless of whose name appears as the party liable on the lease. Moreover, the chapter 7 trustee conducted a detailed examination of that account and was satisfied that he had no basis to attempt to recover any of the payments made from that account as preferential transfers of the Debtor. One other closed account at the Bank

of Wheat Ridge was not scheduled on the SOFA that should have been. It had a zero balance as of the petition date and was the source of no transfers of interest.

The Debtor failed to list a bank account, jointly owned with her husband, which had a negative balance on the Petition Date. According to the UST, Debtor failed to report $7,420.00 of payments made to insiders from that account during the year prior to the Petition Date. Of that amount, $300.00 was paid to Linda Phouminh and the balance was paid out to Debtor's husband, co-owner of the account. It is not self-evident to the Court that money removed from a bank account by one of the account's joint owners equates to a payment made to an insider and is necessarily reportable in SOFA question 3.b. It is also significant that the chapter 7 trustee has not moved to seek a judgment against Debtor's husband in an attempt to recover the $7,120.00 that was used by him from the joint account during the year prior to the bankruptcy filing.

Some subsections of § 727(a) dealing with denial of discharge provide for something akin to strict liability. The provisions contained in §§ 727(a)(3) and (5), for example, require no intent to deceive or any actual wrongdoing on the part of a debtor. Section 727(a)(4)(A) is different. It clearly does require that the Court find that the Debtor intended to deceive the trustee and creditors by fraudulent reporting on the Debtor's schedules and statements. At minimum, to establish liability under § 727(a)(4)(A), the Court must find that the Debtor was reckless in the completion of her statements and schedules. In this case, it is a close question due to the number of inaccuracies uncovered by the UST.

Despite the number of inaccuracies, none of them deprived the chapter 7 trus-

tee from recovering estate assets or affected the rights of creditors. The chapter 7 trustee was satisfied with Debtor's level of cooperation in the administration of the estate. The Court finds no evidence that the Debtor withheld or attempted to conceal information from the chapter 7 trustee.

The Court found the Debtor to be a credible witness. From the testimony of the Debtor and her original counsel, and their description of the process by which the original schedules were completed, the Court cannot find that the Debtor acted with a reckless disregard of her duty to provide accurate information on her schedules and statements. Accordingly, the Court will deny the UST's complaint with respect to denial of discharge under § 727(a)(4)(A).

*C. Denial of Discharge under § 727(a)(5)*

The Bankruptcy Code, like the Bankruptcy Act, carries forward the strong public policy of allowing a discharge of debt to the honest but unfortunate debtor. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); *Hanover Nat. Bank v. Moyses,* 186 U.S. 181, 192, 22 S.Ct. 857, 862, 46 L.Ed. 1113 (1902). Under § 727, the strong presumption is in favor of granting relief. *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1292–93 (10th Cir.1997) ("the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor"); *United Bank v. Greenwalt (In re Greenwalt),* 48 B.R. 804, 805 (D.Colo.1985); *Duval v. Portner (In re Portner),* 109 B.R. 977, 985 (Bankr.D.Colo. 1989). But also in evidence in § 727 is the equally strong public policy that a discharge of debt is extraordinary relief that must not be granted in the absence of absolute transparency of the debtor's affairs. *In re Riccardo,* 248 B.R. 717, 723–724 (Bankr.S.D.N.Y.2000). Thus, under some provisions of § 727, it is unnecessary for the party objecting to discharge to prove or even allege fraudulent acts or a corrupt motive on the part of the debtor. *See, e.g.,* 11 U.S.C. §§ 727(a)(3) & 727(a)(5). To be denied a discharge under § 727(a)(3) it is sufficient that the debtor has failed to maintain records. Under the provisions of § 727(a)(5), a debtor will not be granted a discharge where it appears to the court that the debtor should have had the resources available to deal fairly with creditors, but is unable to explain the disposition or loss of those assets. A lack of detailed information as to the debtor's affairs prejudices creditors by making it difficult for the trustee to administer the estate and recover assets that may otherwise be recoverable for the benefit of creditors. As well, a lack of transparency creates a cloud of doubt as to the true nature of the debtor's pre-petition activities. Where the ability to maintain records and explain the loss of assets is fully within the debtor's control, it would be inequitable to grant a discharge to an individual who, by his or her own actions, with or without fraudulent intent, has made it impossible to administer the estate or determine where the debtor's assets have gone.

Specifically, § 727(a)(5) provides that

> The court shall grant the debtor a discharge, unless … the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(5).

A party objecting to a debtor's discharge under § 727(a)(5) has the burden of proving facts establishing that a loss

or shrinkage of assets actually occurred. However, once the objecting party meets its initial burden of proof, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner.

*Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001).

■ Once the party objecting to discharge has satisfied its burden of showing that the debtor possessed assets that have not been accounted for, the debtor's explanation for a diminution of assets must be specific and corroborated. An explanation of the debtor's circumstances in general terms that is merely suggestive of reasons that assets became depleted falls short of the mark. *Bell v. Stuerke (In re Stuerke)*, 61 B.R. 623, 626 (9th Cir. BAP 1986) (citing *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984)) ("Vague and indefinite explanations of losses that are based on estimates uncorroborated by documentation are unsatisfactory.").

■ The UST presented no evidence that the Debtor could not account for the disposition of specified hard assets such as real estate, automobiles or other valuables. As to this Count of the Amended Complaint, he argues that the Debtor earned extraordinary amounts of income for which she has not accounted.

It is undisputed that the Debtor had gross income for the year 2001 in an amount not less than $327,437.92. Her gross income for 2002 was at least $304,888.50 and her 2003 gross income for the period up to the petition date was at least $65,963.78. Thus, the UST has documented the Debtor's gross income for the period from January 1, 2001 through August 25, 2003, in the total amount of $698,290.20.

The stipulated facts account for some $67,121.00 paid out of the Super Asian Market account to unrelated creditors within 90 days of the petition date,[3] and $7,420.00 paid out during the year prior to the petition date to Debtor's husband and to Linda Phouminh. The Debtors' Schedule J reports $4,872.00 in monthly living expenses. The amount of $30,000.00 is reported by the Debtor on her SOFA as a gambling loss. Thus, for the same 2 year, 8 month period covered by the above income, $155,904.00 is accounted for in living expenses and $74,541.00 is accounted for by the above noted transfer payments. That adds up to $260,445.00.

The Debtor's evidence suggested that substantial amounts of money went into the Debtor's failed grocery business and translation businesses. The Debtor's evidence also suggested that money was used for gambling purposes. But the Debtor's evidence in that regard consisted of little more than suggestions. The Debtor fell far short of meeting her burden to account for the nearly $700,000.00 which she earned in the 2 years and 8 months prior to her bankruptcy filing.

The nature of the asset under consideration here is cash in the form of current income as opposed to tangible assets or even assets accumulated in investment or similar accounts. Given the nature of those cash assets, it is unrealistic to expect a strict accounting for every dollar. But, in this case, there is more than $400,000.00 for which there has been no appreciable effort to account.

During the administration of her bankruptcy estate, and over the course of this

---

3. By including this amount in the Court's calculation, the Debtor gets the benefit of the doubt. There was no evidence that this amount came from the Debtor's personal earnings.

litigation, Debtor produced substantial financial records to the chapter 7 trustee and to the UST. Either those records do not explain the dissipation of large amounts of Debtor's income over the past 2 years and 8 months or the Debtor has failed to point to anything in them to assist the Court in finding that explanation. In either case, given the huge disparity between the Debtor's proven income over that period of time and the expenditures for which the Court has some documentation, the Court must find that the Debtor has failed to satisfactorily explain the deficiency of assets to meet the her obligations. As a consequence, the Court must deny the Debtor her discharge under § 727(a)(5).

## IV. CONCLUSION

In accordance with the above discussion, the Court finds that the Debtor has maintained adequate financial records such that the Court will deny the UST's claim for relief under § 727(a)(3). The Court must also deny the UST's claim for relief under § 727(a)(4)(A) because the Court does not find that the Debtor acted with either actual or constructive fraudulent intent with respect to inaccuracies that appeared in her bankruptcy statements and schedules. However, the Court will grant the UST's prayer for relief under § 727(a)(5). The Court finds that the Debtor's income during the two year and eight month period leading up to her bankruptcy filing amounted to nearly $700,000.00, but she has not presented evidence that accounts, with any degree of specificity, for the dissipation of more than $400,000.00 of that income. The very substantial difference between the Debtor's established income and her documented expenditures requires this Court, under § 727(a)(5), to deny the Debtor the privilege of a discharge of her debts in this bankruptcy proceeding. Therefore, it is

**ORDERED** that the United States Trustee's Amended Complaint to Deny Discharge is hereby GRANTED. Discharge of Debtor's debts is denied.